[No. A134019. First Dist., Div. Two. Feb. 11, 2013.]

SCOTT CALL JOLLEY, Plaintiff and Appellant, v.
CHASE HOME FINANCE, LLC, et al., Defendants and Respondents.

## Counsel

Law Offices of Vernon Bradley and Vernon Bradley for Plaintiff and Appellant.

Law Offices of Sohnen & Kelly, Harvey Sohnen and Patricia M. Kelly for Defendants and Respondents.

## Opinion

RICHMAN, J.—Plaintiff Scott Call Jolley and Washington Mutual Bank (WaMu) entered into a construction loan agreement in 2006, which eventually encountered problems due to alleged failures by WaMu to properly disburse construction funds. As Jolley was continuing to attempt to salvage the transaction, WaMu went into receivership with the Federal Deposit Insurance Corporation (FDIC), and in September 2008 JPMorgan Chase[1] (Chase) bought WaMu's assets through a purchase and assumption agreement (Agreement or P&A Agreement). Jolley soon stopped making payments on the loan, and in late 2009 Chase took steps to foreclose.

Two days before the scheduled foreclosure sale, Jolley sued Chase and California Reconveyance Company (CRC), the trustee, alleging eight causes of action, including misrepresentation, breach of contract, and negligence. Defendants jointly moved for summary judgment or, in the alternative, summary adjudication, Chase's position based in large part on the theory that under the P&A Agreement Chase had not assumed the liabilities of WaMu. The Agreement was put before the court only in a request for judicial notice, which Agreement, an expert witness for Jolley declared, was not complete. Without addressing the expert's testimony, the trial court granted the request for judicial notice and, rejecting all of Jolley's arguments, granted summary judgment for both defendants.

Jolley appeals, arguing that there are triable issues of material fact relating to the financing debacle, not just limited to the claimed inauthenticity of the

---

[1] JPMorgan Chase is the successor corporation to both Chase Home Finance, LLC, and California Reconveyance Company (CRC). We refer to the Chase entities collectively as Chase.

Agreement but also as to misconduct by Chase itself. We agree, and we reverse the summary judgment for Chase, concluding that six causes of action must proceed against it, all but the causes of action for declaratory relief and accounting. We affirm the summary judgment for CRC.

## BACKGROUND

*The Underlying Facts*

In January 2006 Jolley entered into a construction loan agreement with WaMu through which he borrowed $2,156,000 to renovate a house to be used as a rental property in Tiburon, a property he had earlier purchased with a loan from WaMu, having put down $330,000 on the $1,650,000 purchase price. After the construction loan agreement was signed, WaMu disbursed the money to pay off its own first mortgage, approximately $1.3 million. Jolley understood that approximately $1 million would be available to cover construction costs for the renovation.

Jolley claims WaMu lost the loan documents, which held up construction financing for approximately eight months. Construction went forward nonetheless, with Jolley incurring at least $100,000 in construction expense. Jolley testified that WaMu made false representations, including that amounts prepaid for construction ($328,308.79) would be reimbursed to him. He further claims there were significant irregularities in the loan disbursements, with the result that WaMu claimed it had disbursed more of the money than he had actually received, which errors caused delays in construction that resulted in financial losses.

Jolley retained an attorney to assist him, and by May 2006 the attorney had written to WaMu to try to straighten out these problems. In August 2006 Jolley retained Jeffrey Thorne, a former WaMu employee, to review implementation of the agreement and to facilitate its modification. Thorne went through the files and concluded that Jolley had not received approximately $350,000 due him under the loan agreement. Thorne wrote a detailed memorandum to WaMu explaining the problems, which memorandum recommended that the loan amount be increased to $2,485,000.

WaMu "eventually agreed to the modification . . ." and on October 5, 2006, WaMu and Jolley executed a loan modification based on an expansion of the original construction project from 2,500 square feet to 5,000. This was done at WaMu's insistence, as Jolley was told that increasing the size and scope of the project would qualify him for a higher loan amount. Even at that time, Thorne warned that the loan amount needed to be increased by $400,000 to complete the enlarged project. The modification agreement itself does not

specify a new maximum amount to be disbursed, but indicates the new principal amount would be "Variable: new principal amount." And WaMu "promised that if [Jolley] increased the square footage and scope of the work that [WaMu] would supply the additional funds needed to complete the construction . . . ."

The modified agreement called for completion of construction by July 1, 2007, and required Jolley to make monthly interest and principal payments of $16,181.12 beginning August 1.[2] Exactly what transpired from October 2006 to September 2008 is somewhat hazy from the record, but construction apparently continued, with Jolley continuing to make interest payments. If we read Chase's documents correctly, the last disbursement was in June 2008.

On September 25, 2008, WaMu was closed by the Office of Thrift Supervision, and the FDIC was appointed receiver. (U.S. Dept. Treasury, Off. of Thrift Supervision Order No. 2008-36 (Sept. 25, 2008); see 12 U.S.C. § 1821(c).) On the same date, Chase acquired certain assets of WaMu, including all loans and loan commitments. According to Chase, the acquisition was pursuant to the P&A Agreement, which agreement was between the FDIC as receiver and Chase.

Section 2.1 of the Agreement specified the liabilities Chase was assuming: "Subject to Sections 2.5 and 4.8, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as 'Liabilities Assumed'). Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank." Jolley contends Chase assumed liability for WaMu's failures in servicing Jolley's loan as part of its "mortgage servicing . . . obligations."

Section 2.5 of the Agreement expressly provided, however, that Chase would assume no liabilities associated with borrower claims arising out of WaMu's lending activities: "Notwithstanding anything to the contrary in this Agreement, any liability associated with borrower claims for payment of or

---

[2] Payments on the construction loan were interest-only during construction and varied in amount depending on the status of funding. Once construction had been completed, the balance of the loan was to be rolled over into a fully amortized mortgage on the home. A reserve was included to pay the interest payments during construction. Because the reserve had been calculated based on the predicted length of construction, it proved to be insufficient to cover interest payments during the extended construction period.

liability associated with borrower claims for payments of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower, whether or not such liability is reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, judicial or extra-judicial, secured or unsecured, whether asserted affirmatively or defensively, related in any way to any loan or commitment to lend made by the failed Bank prior to the failure, or to any loan made by a third party in connection with a loan which is or was held by the Failed Bank, or otherwise arising in connection with the Failed Bank's lending and loan purchase activities are specifically not assumed by the assuming Bank." As will be seen, this paragraph played a central role in the trial court's decision granting summary judgment.

According to Jolley's testimony, "Once Chase had taken over the operations of [WaMu], they continued in the construction loan department with the same people that I had been dealing with when [WaMu] still owned the loan. I had dealt with Mabette Del Rosario, Neil Lampert, and Jed Sonstrom in the legal department . . . . After the takeover by Chase, Mabette Del Rosario continued to run the construction disbursement department. I was led to believe that because Chase had taken over the loan from [WaMu], it was still going to honor the original agreement which said in the addendum Construction/Permanent Loan Part One: 'When all conditions prior to rollover are met as described in the construction loan agreement, the loan will rollover to a fully amortized loan.' " Another Chase employee with whom Jolley would come to deal was Andrew North.

In November 2008, shortly after Chase had entered the picture, Jolley made his last monthly payment on the loan, claiming he was forced to default thereafter by WaMu's breaches and negligence in funding the construction loan. The total amount owing on the loan by the time of Jolley's default, according to Chase's records, was $2,426,650. At the time of Jolley's default, construction had not been completed, but was allegedly completed sometime between April 2009 and April 2010.

After Chase's involvement Jolley tried to secure a loan modification, with Thorne continuing to advocate, on Jolley's behalf, that Jolley would need an additional $400,000 to complete construction. Thorne and Jolley both told Chase "in great detail" about the prior problems with the loan.

As indicated, the original construction loan contained a rollover provision. Chase claims it was not obligated to honor it because Jolley was in default and construction had not been completed when he went into default, and thus "all conditions prior to rollover" had not been met.

But, Jolley testified, he was encouraged on many occasions by North that, in light of the history of problems with WaMu, there was a "high probability" that Chase "would be able to modify the loan so as to avoid the foreclosure." North said the "likelihood was good," that it was "likely" when construction was complete he could roll the construction loan into a fully amortized conventional loan. Jolley further testified that as a result of these representations he was induced to "borrow heavily to finish the project." In addition to other damages, Jolley claims the construction delays and "inordinate delay" during the loan modification negotiations prevented him from selling the property before the housing market collapsed.

Ultimately, instead of agreeing to a loan modification, Chase demanded payment of the loan in full.[3] On December 29, 2009, CRC, as trustee, recorded a notice of default, and on March 30, 2010, recorded and served a notice of sale.

On April 5, 2010, North sent Jolley an e-mail saying he had requested the Chase foreclosure department to hold off on its planned foreclosure, "which means any future sale dates will be postpone [*sic*] to give us the opportunity to see if we can modify the collateral property." Chase refused.

*The Proceedings Below*

*The Complaint*

On April 19, 2010, two days before the scheduled foreclosure sale, Jolley filed this lawsuit. It named Chase Home Finance, LLC, and CRC, and alleged eight causes of action: (1) fraud and deceit—intentional misrepresentation;[4] (2) fraud and deceit—negligent misrepresentation; (3) breach of contract/promissory estoppel; (4) negligence; (5) violation of Business and Professions Code section 17200 et seq.; (6) declaratory relief; (7) accounting; and (8) reformation. Though CRC was named as a defendant, no specific wrongdoing was alleged with respect to it.

On April 20, 2010, Jolley obtained a temporary restraining order prohibiting Chase from going forward with the trustee's sale. And on August 20, 2010, a preliminary injunction was issued, with Jolley putting up a $50,000 bond.

---

[3] Documents submitted by Chase show the outstanding principal owing at default in December 2008 was $2,426,650, increased to $2,632,066.99 when the notice of default was recorded. By the time the motion was filed in August 2011, Chase calculated it was owed $3,019,693.29.

[4] Jolley's complaint referred to both WaMu and Chase collectively as "the Bank," making it difficult to ascertain which conduct was alleged with respect to which entity.

Meanwhile, an answer was filed on behalf of Chase and CRC jointly.

Jolley's lawsuit rested in part on the theory that Chase was the successor in interest to WaMu and therefore had "stepp[ed] into the shoes" of WaMu and was liable for any misrepresentation, negligence, or breach of contract on its part under California law and under the construction contract he had signed with WaMu. Jolley relied on language in paragraph 13 of his agreement with WaMu that made "the covenants and agreements" binding on "the successors and assigns of [WaMu]." Jolley also relied on Civil Code section 1589, which requires one who takes the benefit of a transaction to also assume its liabilities.[5]

*The Motion and the Request for Judicial Notice*

On August 25, 2011, Chase[6] filed a motion for summary judgment or, in the alternative, summary adjudication, fundamentally claiming that it had no liability for borrower claims based on WaMu's conduct prior to the FDIC receivership. It relied on federal law relating to the powers of the FDIC as receiver and on the terms of the P&A Agreement, specifically that it had acquired only the assets of WaMu in its purchase from the FDIC, not the liabilities. This contention was based on section 2.5 of the Agreement quoted above, which had also been asserted as an affirmative defense in Chase's answer. The motion was set for hearing on November 15, 2011.

Simultaneously with filing its motion, Chase filed a request for judicial notice that requested "the Court to take judicial notice pursuant to California Evidence Code Sections 450–460" of five facts, the first of which was as follows: "1. On September 25, 2008, Washington Mutual Bank, N.A. ('WaMu') was closed by the Office of Thrift Supervision, and the Federal Deposit Insurance Corporation (FDIC) was named Receiver for WaMu pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d). Pursuant to the Purchase and Assumption Agreement between the FDIC as Receiver for WaMu, and Chase, dated September 25, 2008, Chase acquired certain of the assets of WaMu, including all loans and loan commitments of WaMu. A copy of that Purchase and Assumption Agreement is attached hereto as Exhibit A and can be found on the FDIC's website at

---

[5] That section reads: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." (Civ. Code, § 1589.)

[6] The motion was actually filed on behalf of both named defendants, Chase and CRC. As noted, no charging allegations were made in Jolley's complaint against CRC, and his opposition to the motion said essentially nothing about it. Thus, the focus of the proceedings below, and here, is on Chase, and for ease of discussion we refer to Chase as the moving party.

http://www.fdic.gov/about/freedom/Washington_Mutual_P_and_A.pdf."[7] The attached copy was 39 pages, including exhibits. No separate points and authorities accompanied Chase's request for judicial notice.

### Jolley's Opposition

Jolley filed opposition to the motion. He also objected to the request for judicial notice as to the P&A Agreement, and filed points and authorities supporting his position, most fundamentally disputing that the 39-page Agreement was the complete document governing Chase's purchase of WaMu. Thorne, who at one time worked at the FDIC as an independent contractor, filed a declaration stating he had seen and read a 118-page P&A Agreement for the Chase purchase of WaMu. Thorne claimed the longer document had never been made public and its provision governing assumption of liability was different.

In November 2011, Jolley began trying to secure a copy of the 118-page agreement referred to in Thorne's declaration. His counsel requested a copy from the FDIC, and also apparently served a subpoena duces tecum seeking production of it. According to Jolley's counsel, the FDIC refused to produce the document unless all parties to the litigation signed a confidentiality agreement. On November 9, 2011, six days before the motion was to be heard, Jolley requested that counsel for Chase sign a confidentiality agreement. She refused to do so.[8] On or about November 14, 2011, Jolley filed an ex parte application seeking to continue the motion, to keep discovery open, and to continue the trial date so that further efforts could be made to obtain the longer agreement.[9]

Meanwhile, Chase had filed a reply to Jolley's opposition, which included 62 objections to Jolley's evidence, 40 of which objected to particular testimony in Thorne's declaration or his deposition.

### The Ruling on the Motion

Argument on the motion was heard on November 15, most of which focused on Thorne's declaration, at the conclusion of which the matter was taken under submission. On December 1, the court entered its order granting summary judgment, which order reads in pertinent part as follows:

---

[7] The remaining "facts" were four paragraphs attaching what were claimed to be "certified" or "true and correct" copies of documents recorded in Marin County.

[8] We cast no aspersions on Chase's counsel for her position, as the confidentiality agreement prepared by Jolley's counsel did not specify the documents requested.

[9] We find no express ruling on Jolley's ex parte application for a continuance, but it was effectively denied by the grant of summary judgment.

"The Court affirms its tentative ruling which stated as follows:

"The undisputed evidence establishes that Defendant Chase Home Finance, LLC (Chase) is not liable for the alleged intentional and negligent misrepresentations (causes of action nos. 1 & 2), made to Plaintiff by employees of the Washington Mutual Bank in relation to the Construction Loan issued to Plaintiff, pursuant to the Purchase and Assumption Agreement through which Chase acquired Washington Mutual from the FDIC on September 25, 2008.

"Under that Agreement, Chase expressly did not assume liability for borrower's claims 'related in any way to any loan or commitment to lend made by the Failed Bank prior to failure, . . .' or 'otherwise arising in connection with [WaMu's] lending or loan purchase activities . . . .' (Request to Take Judicial Notice, Ex. 1, P&A Agreement ¶ 2.5) [¶] . . . [¶]

"The third cause of action for Breach of Contract/Promissory Estoppel also fails, as the undisputed evidence shows that Defendants never promised to modify the Washington Mutual Construction, or to issue Plaintiff any additional funds to complete the Project. No enforceable promise or loan modification agreement was created by Chase's conduct.

"Chase's employee Mr. North's representations to Plaintiff that approval of his loan modification application was 'likely', 'highly probable', and 'looks good', are all opinions of Mr. North, which do not create a binding commitment to modify a loan, nor do they represent the fact that the loan has been approved.

"These hopes or expectations expressed by North do not constitute either: a clear and unambiguous promise to approve the application; nor do they evidence any terms to create an enforceable contract. (See *Laks v. Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d 885, 891, 893 [131 Cal.Rptr. 836] [agreement to make construction loan was expressly conditional, and lacked essential terms of the loan, and could not support a cause of action for promissory estoppel].)

"Also, there is no evidence to suggest that Mr. North had authority to approve a loan modification either by himself, or with the consent of others.

"A borrower's 'understanding or expectation that the Bank would extend a loan is not sufficient to establish an agreement to make a loan. [Citation.]' (*Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 156 [53 Cal.Rptr.2d 336].) 'To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.

[Citations.]' *(Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770 [23 Cal.Rptr.2d 810].) 'When the evidence clearly shows that the only (and the complete) subject matter that is under consideration is left for further negotiation and agreement, there is no contract, not for vagueness or indefiniteness of terms but for lack of any terms. [Citation.]' *(Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 59 [248 Cal.Rptr. 217].)

"The motion is granted on the fourth cause of action for Negligence.

" 'Under California law, a lender does not owe a borrower or third party any duties beyond those expressed in the loan agreement, except those imposed due to special circumstance.' *(Sipe v. Countrywide Bank* (E.D.Cal. 2010) 690 F.Supp.2d 1141, 1153, citing *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 [283 Cal.Rptr. 53].) . . . .

"The undisputed evidence shows that Chase and Plaintiff engaged in the typical lender/borrower relationship. Plaintiff has not presented evidence of special circumstances on which to impose a general duty of due care. (See *Sipe v. Countrywide Bank*[, *supra*,] 690 F.Supp.2d 1141, 1153.)

"Moreover, the complaint does not allege, and there is no evidence to establish, that Chase committed a negligent act after acquiring Plaintiff's loan."

Then, after disposing of the other four causes of action, the order concludes with this: "Defendants' Request to Take Judicial Notice is granted. (Evid. Code § 452(c)(d))."

No ruling was made on any of the evidentiary objections.

Judgment was thereafter entered accordingly, from which Jolley filed a timely notice of appeal.

## DISCUSSION

1. *Summary Judgment Law and the Standard of Review*

We collected and confirmed the applicable law in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253–254 [100 Cal.Rptr.3d 296]:

"Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) As applicable here, moving defendants

can meet their burden by demonstrating that 'a cause of action has no merit,' which they can do by showing that '[o]ne or more elements of the cause of action cannot be separately established . . . .' (§ 437c, subd. (*o*)(1); see also *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 486–487 [59 Cal.Rptr.2d 20, 926 P.2d 1114].) Once defendants meet this burden, the burden shifts to plaintiff to show the existence of a triable issue of material fact. (§ 437c, subd. (p)(2).)

"On appeal '[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. [Citations.]' (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].) Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiff's claims. (*Romano v. Rockwell Internat., Inc., supra,* 14 Cal.4th at p. 487.) As we put it in *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320 [7 Cal.Rptr.3d 628]: '[W]e exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit.' (Accord, *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972 [103 Cal.Rptr.2d 672, 16 P.3d 94].)

"But other principles guide us as well, including that '[w]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67 [105 Cal.Rptr.2d 652].) And we must ' "view the evidence in the light most favorable to plaintiff[] as the losing part[y]" and "liberally construe plaintiff['s] evidentiary submissions and strictly scrutinize defendant['s] own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiff['s] favor." ' (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97 [84 Cal.Rptr.3d 734, 194 P.3d 1026].)"

### 2. *The P&A Agreement: Judicial Notice, the Law, and Thorne's Testimony*

As noted, Chase requested judicial notice of the P&A Agreement attached to the declaration of its counsel, who represented that it was a copy of the agreement found on the FDIC Web site. The declarant was not a custodian of records, was not a party to the Agreement, gave no indication she was involved in negotiating or drafting it, and provided no background as to how she acquired knowledge of the document. Indeed, she did not even aver it was a true and complete copy.

We also note that the request was for judicial notice of the fact that on September 25, 2008, "Chase acquired certain of the assets of WaMu, including all loans and loan commitments of WaMu." The papers did *not* request judicial notice that Chase did *not* assume liabilities based on borrower claims. Unquestionably, the trial court below used the Agreement for a much broader purpose, namely to prove that Chase did not assume liability for WaMu's alleged misdeeds with respect to Jolley's loan.

We conclude this was error, and that the content and legal effect of the P&A Agreement could not properly be determined on judicial notice under California law. And certainly not here.

■ Judicial notice, of course, may be utilized on a motion for summary judgment. (Code Civ. Proc., § 437c, subd. (b)(1); *Herrera v. Deutsche Bank National Trust Co.* (2011) 196 Cal.App.4th 1366, 1374 [127 Cal.Rptr.3d 362].) But only to the extent authorized by our state statutes. (Evid. Code, § 450.)

As noted above, Chase's request for judicial notice requested it, however unhelpfully, "pursuant to . . . Evidence Code Sections 450–460." As also noted, the order granting summary judgment ended with the ruling that Chase's request for judicial notice was also granted, citing Evidence Code section 452, subdivisions (c) and (d).

The Evidence Code section cited by the trial court allows for permissive judicial notice respectively of "(c) Official acts of the legislative, executive, and judicial departments of the United States and of any state of the United States" and "(d) Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States." (Evid. Code, § 452, subds. (c) & (d).)

■ Certainly the P&A Agreement does not come within Evidence Code section 452, subdivision (d), as it is not a record of any court. And while it is true that section 542, subdivision (c) "enables courts in California to take notice of a wide variety of official acts. . . . [and] an expansive reading must be provided to certain of its phrases [and] included in 'executive' acts are those performed by administrative agencies" (Simons, Cal. Evidence Manual (2012) Judicial Notice, § 7:11, p. 544), we do not understand a contract with a private bank to come within that subdivision.

Apparently satisfied itself that the two subdivisions cited in the trial court's order are unsupportive, Chase's brief cites two different subdivisions, and asserts that "judicial notice may be taken of the following:

"(g) Facts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute.

"(h) Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

In claimed support, Chase first cites some cases clearly inapposite, such as cases dealing with State Bar records (*In re White* (2004) 121 Cal.App.4th 1453 [18 Cal.Rptr.3d 444]) and the " 'definition of "mass transportation" ' " (*Shaw v. People ex rel. Chiang* (2009) 175 Cal.App.4th 577, 605 [96 Cal.Rptr.3d 379]). Chase then goes on: "[s]imilarly, under federal law the information on government agency websites has often been treated as a proper subject for judicial notice by numerous circuits (*See, e.g., Paralyzed Veterans of Am. v. McPherson*, No. C 06-4670 SBA, 2008 WL 4183981, at p. *5 (N.D. Cal. Sept. 9, 2008) (and cases cited therein).) [¶] Here, the P&A Agreement is available on a public Web site maintained by the FDIC. It is not reasonably subject to dispute and is capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy. The taking of judicial notice of the terms of the P&A Agreement was not in error."[10] (Fn. omitted.) Chase then concludes as follows: "Chase and CRC

---

[10] The referenced footnote says that "Federal Courts have taken judicial notice of the P&A Agreement and similar agreements with the FDIC. (*Allen v. United Fin. Mortgage Corp.*, 660 F.Supp.2d 1089, 1093 (N.D. Cal. 2009) (judicial notice taken of the P&A Agreement even though a few pages missing from that offered by defendant, because the Agreement is available online, from the FDIC's web site; *In re Sharp*, Case No. 09-13980 A P. No. 10-1032 (N. D. Cal. Bk.); *Jarvis v. JP Morgan Chase Bank, N.A.*, 2010 WL 2927276, at *1, (C.D. Cal. July 23, 2010); *see also Yeomalakis v. F.D.I.C.*, 562 F.3d 56, 60 (1st Cir. 2009.) (Resp. App. 86-89.)"

Some federal courts have taken judicial notice of the same or similar purchase and assumption agreements, frequently without discussion or analysis, either because they were deemed "public records" or because their contents could be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." (Fed. Rules Evid., rule 201(b)(2), 28 U.S.C.; see *Rosenfeld v. JPMorgan Chase Bank, N.A.* (N.D.Cal. 2010) 732 F.Supp.2d 952, 958–960 [dismissing claims against Chase despite claim that it engaged in loan modification negotiations with plaintiff]; *McCann v. Quality Loan Service Corp.* (W.D.Wn. 2010) 729 F.Supp.2d 1238, 1241–1242 [in context of claims relating to WaMu refinance transaction, collecting cases holding Chase not liable for WaMu's conduct]; *Cassese v. Washington Mutual* (E.D.N.Y., Dec. 22, 2008, No. 05 CV 2724 (ADS) (ARL)) 2008 U.S.Dist. Lexis 111709, pp. *6–*7 [same, including claims of fraud and breach of contract]; *Moncrief v. Washington Mutual* (S.D.Cal., June 28, 2010, No. 10CV350 DMS (RBB)) 2010 U.S.Dist. Lexis 64100, pp.*6–*7 [same for claims filed after Chase acquired WaMu's assets].)

Some cases have found the language of section 2.1 of the P&A Agreement creates a degree of uncertainty about whether Chase assumed specific liabilities depending on whether it acted as lender, loan servicer, or both. (See *Hayes-Broman v. J.P. Morgan Chase Bank* (D.Minn. 2010) 724 F.Supp.2d 1003, 1015; *Punzalan v. FDIC* (W.D.Tex. 2009) 633 F.Supp.2d 406, 414 & fn. 5; *In re Pena* (Bankr. S.D.Tex. 2009) 409 B.R. 847, 859–862.)

sought the taking of judicial notice of a document which is not hearsay, but which itself contains admissible evidence."

Maybe some federal cases might allow this. California law does not. (*Searles Valley Minerals Operations, Inc. v. State Bd. of Equalization* (2008) 160 Cal.App.4th 514, 519 [72 Cal.Rptr.3d 857] [taxpayers who produced and sold electricity requested judicial notice of materials contained on Web site pages of American Coal Foundation and U.S. Dept. of Energy under Evid. Code, § 452, subd. (h); held: request was properly denied, as though "it might be appropriate to take judicial notice of *the existence* of the Web sites, the same is not true of their factual content"].)

██ Chase makes much of the fact that the P&A Agreement is posted on the FDIC Web site, which it calls an "official governmental agency," apparently believing this fact alone makes the legal significance of the Agreement subject to judicial notice. While there may be federal cases that adopt this approach, frequently without analysis (see fn. 10, *ante*), we know of no "official Web site" provision for judicial notice in California. (See *L.B. Research & Education Foundation v. UCLA Foundation* (2005) 130 Cal.App.4th 171, 180, fn. 2 [29 Cal.Rptr.3d 710].) "Simply because information is on the Internet does not mean that it is not reasonably subject to dispute." (*Huitt v. Southern California Gas Co.* (2010) 188 Cal.App.4th 1586, 1605, fn. 10 [116 Cal.Rptr.3d 453].)

In typically scholarly fashion, Witkin has an elaborate exposition of the law of judicial notice in 1 California Evidence (5th ed. 2012) Judicial Notice, ch. 2, page 109 et seq. Beginning at section 32, the author discusses "[m]atters [c]ommonly [k]nown or [r]eadily [d]eterminable," and goes on for several sections with descriptions of cases and "illustrations" of such facts. One looks in vain for any case remotely supporting Chase's position here. In sum, we hold that judicial notice was not properly taken of the content of the P&A Agreement even if there was no dispute about its authenticity. A fortiori here, where the very authenticity of the Agreement was in dispute.

As described above, Jolley's opposition included a declaration from Thorne, who had been a "senior construction loan consultant" with WaMu until July of 2006, having been in charge of construction lending in 38 states since May 2005. He was an "asset manager for the FDIC" at the time he signed the declaration (Oct. 2011), and was "intimately familiar with the procedures for taking over a failed bank." And he testified: "Pursuant to the public part of the agreement with the FDIC, of which were approximately 36 pages, the balance of the contract and the complete agreement with the FDIC and Chase bank is 118 pages long which has not been made public. I am familiar with this agreement, I read it." Though somewhat ungrammatical, the

declaration fairly clearly recites the existence of a nonpublic agreement (or portion of an agreement) that could affect the outcome of this case. In short, Thorne testified that the P&A Agreement submitted by Chase was not the full agreement entered between Chase and the FDIC, but rather a longer version exists, the terms of which are different from the version of which the court below took judicial notice.

Thorne also made certain representations about the content of the missing pages, claiming the FDIC guaranteed 80 percent of any failed WaMu loans, while Chase assumed only 20 percent of potential losses on the loans by receiving an 80 percent discount on WaMu's assets. In his deposition Thorne not only referred to the P&A Agreement being 118 pages long, but also testified that it obligated Chase "to work directly with the customers to do as much as possible to modify any loans . . . so that no foreclosures are made and borrowers are kept in their homes." The missing part of the document "spells out an agreement between the purchasing institution and the FDIC as to how they are to handle the customers upon the purchase of the bank; i.e., how the foreclosures are to be handled, work out agreements that they're supposed to make. . . . They just can't go in and just start foreclosing on everybody that's not paying."

Chase filed 62 objections to Jolley's evidence, including 33 objections to particular aspects of Thorne's declaration and seven objections to particular statements in his deposition. We are concerned primarily with objections 5 and 60, objecting to Thorne's statements that a 118-page purchase and assumption agreement exists, objections based on the best evidence rule, lack of foundation, and lack of competency.[11]

As noted, the trial court did not rule on these, or any other, evidentiary objections, and Jolley preliminarily contends that the objections cannot be maintained here. He is wrong, as specifically held in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 [113 Cal.Rptr.3d 327, 235 P.3d 988], a case involving objections made in a summary judgment proceeding. The Supreme Court held that if the objections were not ruled upon in the trial court, the objections are presumed overruled and are preserved for appeal. We thus turn to the merits of Chase's objections, and find there are none.

Chase questions the competency of Thorne's declaration because he is not a lawyer, was not employed at WaMu at the time of the P&A Agreement, and was never employed by Chase. This, the argument runs, fails to establish personal knowledge or expertise sufficient to opine about the contents of the

---

[11] Chase also argues on appeal that Jolley's testimony is barred by the parol evidence rule and as hearsay. These objections were not made in the trial court, and are thus inappropriate here.

purported nonpublic agreement. Chase also points out that while his declaration says Thorne was an independent contractor at the FDIC at the time he signed the declaration, it fails to show he worked there at the time of the WaMu receivership.

But that is no basis for rejecting Thorne's testimony on the narrow point that a 118-page agreement exists, one that he had personally read. We view his testimony on this point as that of a percipient witness, not an expert.

We may agree with Chase for purposes of argument that Thorne's statements about the contents of the longer agreement were not admissible. But we need not credit those statements in order to conclude that a factual issue has been raised. The judgment in this case rests squarely on the terms of a much shorter, disputed version of the P&A Agreement submitted by Chase. This was wrong. Since Jolley has presented evidence that a longer agreement exists, the court below resolved a disputed issue of fact by resting its decision on the terms of the shorter agreement. Put otherwise, the court did not view the evidence favorably to Jolley. (See *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1145–1146 [37 Cal.Rptr.2d 718] [existence of a written contract could not be judicially noticed where the opposing party claimed that an oral contract governed the relationship].)

It may be true that in some extreme circumstances "a trial court may weigh the credibility of a declaration submitted in opposition to a summary judgment motion and grant the motion 'where the declaration is facially so incredible as a matter of law that the moving party otherwise would be entitled to summary judgment.'" (*People v. Schlimbach* (2011) 193 Cal.App.4th 1132, 1142, fn. 9 [122 Cal.Rptr.3d 804], quoting *Estate of Housley* (1997) 56 Cal.App.4th 342, 359–360 [65 Cal.Rptr.2d 628].) This is not such a case.

Thorne's declaration certainly raises significant issues vis-à-vis Chase and the FDIC, with testimony that is hardly run of the mill. But that testimony is not so incredible that it could be ignored or rejected as untruthful on summary judgment, especially given the FDIC's response here, which not only did not deny the existence of the longer agreement, but suggested there were documents to be produced if there were a confidentiality agreement.

### 3. Summary Adjudication Was Improperly Granted on the First, Second, Third, Fourth, Fifth, and Eighth Causes of Action

#### A. The First and Second Causes of Action, for Misrepresentation

The conclusion that Chase was not liable for WaMu's conduct presupposes acceptance of the P&A Agreement submitted by Chase as the full and

complete contract governing its assumption of liabilities. Since, as discussed above, the Agreement was not properly utilized here, on that basis alone the summary adjudication of first and second causes of action was improper. In addition to the alleged misrepresentations by WaMu, Jolley alleges misstatements by Chase after the receivership, which would render summary adjudication improper for an additional reason if there are triable issues of material fact with respect to such misrepresentations. We find such issues here.

■ The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation; (b) knowledge of falsity; (c) intent to defraud, i.e., induce reliance; (d) justifiable reliance; and (e) damage. (*Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, 93 [111 Cal.Rptr.2d 711]; see *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].) ■ "The tort of negligent misrepresentation, a species of the tort of deceit [citation], does not require intent to defraud but only the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255 [91 Cal.Rptr.3d 532, 203 P.3d 1127].)

Jolley testified that Chase representative North told him in various ways— that it was "highly probable," and "likely," and "look[ed] good"—that a modification of the loan agreement would be approved and the construction loan rolled over into a conventional loan. The trial court concluded there was no evidence of a misstatement of *fact*, but at most an overoptimistic *opinion* upon which Jolley could not reasonably have relied. We disagree.

■ To begin with, it is well settled that an opinion may be actionable when it is made by a party who " 'possess[es] superior knowledge.' " (*Pacesetter Homes, Inc. v. Brodkin* (1970) 5 Cal.App.3d 206, 211 [85 Cal.Rptr. 39].) As one Court of Appeal put it almost 90 years ago, "[W]hen one of the parties possesses, or assumes to possess, superior knowledge or special information regarding the subject matter of the representation, and the other party is so situated that he may reasonably rely upon such supposed superior knowledge or special information, a representation made by the party possessing or assuming to possess such knowledge or information, though it might be regarded as but the expression of an opinion if made by any other person, is not excused if it be false." (*Haserot v. Keller* (1924) 67 Cal.App. 659, 670–671 [228 P. 383]; see *Cohen v. S & S Construction Co.* (1983) 151 Cal.App.3d 941, 946 [201 Cal.Rptr. 173]; see generally Rest.2d Torts, § 542; CACI No. 1904.)

Equally well recognized is that there may be liability for an opinion where it is "expressed in a manner implying a factual basis which does not exist." (*Pacesetter Homes, Inc. v. Brodkin, supra*, 5 Cal.App.3d at p. 211; see generally *Crandall v. Parks* (1908) 152 Cal. 772, 776 [93 P. 1018]; Civ. Code, § 1572; Rest.2d Torts, § 525, com. f, p. 57.) Witkin explains how this rule is often applied to statements about future events, describing it this way: "(3) *Future Events.* As pointed out above . . . , predictions or representations as to what will happen in the future are normally treated as opinion; but sometimes they may be interpreted as implying knowledge of facts that make the predictions probable. If the defendant does not know of these facts, the statement is an actionable misrepresentation. . . . The same is true where an agent states that his or her principal will advance money to harvest a crop, or where a corporation agent represents that the corporation will lease certain property or locate a plant in a certain city. (See *Eade v. Reich* (1932) 120 [Cal.App. 32, 35 [7 P.2d 1043]] [discussing holdings to this effect].)" (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 776, p. 1126, citations omitted; see *Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 241 [70 Cal.Rptr.3d 199] [broker-dealer's oral representations concerning offering of company's bridge notes, that preferred stock offering was " ' "done deal" ' " and that early prepayment of notes was "guaranteed," were actionable statements of facts, rather than opinion or prediction].)

Jolley testified that North told him he was "from the executive offices of Chase," causing Jolley to think he "was dealing with the decision makers at the highest level of Chase Bank." Beyond that, the very assessment of probabilities of a loan modification may have implied that North had discussed the matter with those who actually would make the decision or that he possessed facts from which he could reasonably assess the probabilities. In any event, the matter should have been left to the trier of fact, not determined on summary judgment: "[W]here there is a reasonable doubt as to whether a particular statement is an expression of opinion or the affirmation of a fact, the determination rests with the trier of the facts." (*Willson v. Municipal Bond Co.* (1936) 7 Cal.2d 144, 151 [59 P.2d 974].)

Jolley presented evidence that he in fact relied upon these statements, expending additional sums to complete the construction, and that the promising statements by North induced him to borrow from other sources to finish the renovation. These consequences were entirely foreseeable in light of the history of the construction loan, the unfinished status of the underlying project, and the encouraging statements by North that the loan would likely be rolled over into a conventional loan once construction was completed. Whether Jolley's reliance was justified in the circumstances is a factual question for a jury, not one for summary judgment.

*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465 [261 Cal.Rptr. 735] (*Price*), overruled on other grounds in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1182 [151 Cal.Rptr.3d 93, 291 P.3d 316], relied on by Chase, is not to the contrary. There, the ranch owner plaintiffs took out three loans totaling $370,000 from Wells Fargo to pay off preexisting loans to other banks. (*Price*, at p. 471.) The notes for two of the loans called for repayment within approximately eight months; the third loan documents were less clear but appeared to call for payment at the same time. Testimony by bank officers, however, tended to support the plaintiffs' argument that the parties intended the loans to be paid off over a five-year period. (*Ibid.*) After seeing the early due date in the notes, the plaintiffs discussed the matter with the same bank representative who had helped them with the original loans, who promised to "redo" the loans to reflect the five-year repayment period. (*Price, supra*, 213 Cal.App.3d at p. 472.) The plaintiffs let the eight-month maturity date pass without repaying any principal. When the bank began sending past due letters, the plaintiffs did not insist that the loans be rewritten, but sought a restructuring of the repayments. For a period of time the bank negotiated with the plaintiffs and established alternate repayment terms. However, when the repayment schedule was not kept, the bank initiated foreclosure proceedings. (*Id.* at pp. 472–473.)

The plaintiffs were able to pay off the loans before a foreclosure sale was conducted, and then sued the bank, claiming that in order to pay off the loans they were forced to sell other assets at distressed prices. (*Price, supra*, 213 Cal.App.3d at pp. 473–474.) They alleged several theories based fundamentally on the bank's having taken a " 'hard line' " during negotiations regarding repayment of the loans. (*Id.* at p. 479.) Summary judgment was granted for the bank, which was affirmed on appeal.

Chase points particularly to the statement in *Price* to the effect that the bank would "redo" the loans or "work with" the borrowers, and draws a parallel between those representations and the statements made by North here. We find the analogy unpersuasive. The *Price* plaintiffs admitted in discovery that they understood their obligations under the original notes and never disputed that the amounts claimed by the bank were in fact owed to it. (*Price, supra*, 213 Cal.App.3d at pp. 472, 480–481.) And the alleged promise to "redo" the contract was never asserted during loan renegotiation as a basis for loan modification. (*Id.* at pp. 480–481.) In short, the plaintiffs' own actions undermined any claim of reliance on the misstatement. This is not the situation here.

Chase also cites *Conrad v. Bank of America, supra*, 45 Cal.App.4th 133, which held that a postbankruptcy fraud claim against a bank was precluded

by failure of the borrowers to list that claim in the original bankruptcy filing. (*Id.* at pp. 145–155.) As a second ground for denying relief, the Court of Appeal held that no fraudulent statement had been shown. (*Id.* at pp. 155–156.) The borrower's testimony showed only that he told the banker his company "might need some loans and that it intended to go forward utilizing liquid assets and that kind of thing before talking" further to the bank about loans. The banker reportedly said, " 'No problem.' " (*Id.* at p. 156.) The court observed "[t]hat exchange establishes nothing more than a willingness to consider future loan applications and does not establish a fraudulent promise to make a loan. [Citation.]" (*Conrad, supra,* 45 Cal.App.4th at p. 156.) The court went on that the borrower's "understanding or expectation that the Bank would extend a loan is not sufficient to establish an agreement to make a loan. [Citation.] And his testimony is otherwise lacking in specificity." (*Conrad, supra,* 45 Cal.App.4th at p. 156.)

Here we have more specificity as to a predicted outcome of the loan modification process and the likelihood of its occurrence, as Jolley continued discussions with North into the days immediately preceding the proposed trustee's sale. Indeed, there is documentary evidence that North continued to represent that he would ask the "Foreclosure Department to hold [its] processes," thus making the alleged promises more certain—and more central to the loan renegotiation efforts. And not only did Jolley not act inconsistently with a claim of reliance, he in fact relied, investing additional funds into completing the construction in anticipation that the loan would be rolled into a conventional loan.

While there may not be any direct showing of an intention to defraud, it is clear that Chase would benefit from Jolley's further investment in the construction project. This is so because the bank could ultimately foreclose on a newly renovated property instead of a stalled construction project, making its ability to realize on the asset more fruitful. In addition, prolonging the loan modification process allowed Chase's investment in the property to mount while Jolley's equity, if any, was consumed in a declining real estate market. Drawing all inferences in favor of the nonmoving party, as we must (*Nazir v. United Airlines, Inc., supra,* 178 Cal.App.4th at p. 254), we conclude that prolonged communication—perhaps more accurately, miscommunication—about a possible loan modification raises a triable issue of fact of intent by Chase to profit by misleading Jolley about his loan modification prospects, a showing sufficient to withstand summary adjudication.

B. *The Third Cause of Action, for Breach of Contract/Promissory Estoppel*

On the third cause of action, styled breach of contract/promissory estoppel, Chase claims there was no evidence of a breach by it of WaMu's loan

agreement, again claims the P&A Agreement relieves it of any liability for any breach by WaMu, and claims its own conduct toward Jolley in the form of North's promising forecast of a loan modification did not create a contract or amount to an estoppel. We, of course, disagree as to the P&A Agreement. We also find a triable issue of material fact regarding Chase's own conduct.

Jolley obviously complains that WaMu failed to timely disburse funds in accordance with the loan agreement, but he also appears to claim the failure to fully fund the loan continued through the Chase period. Jolley stated as a disputed fact, "Even with the Modification Agreement, further delays in disbursements as a result of WaMu made it effectively impossible for Jolley to complete the project and commence payments as of August 1, 2007." He also asserted in his declaration, "Chase continued in WaMu's refusal to disburse portions of the construction loan due and to modify the loan to provide necessary funding." And he said, "Chase . . . had an obligation to carry out the terms of the Washington Mutual loan which was to provide adequate funds to complete the modified construction plans after which, Chase . . . [was] responsible for rolling the loan into a permanent financing loan."

Thorne testified that after he got involved on Jolley's behalf, Jolley "received disbursements on the work that had been completed based on the inspection that had been made." The trial court construed that statement as follows: "Plaintiff's expert, Jeffrey Thorne, . . . testified that Plaintiff ultimately received the disbursements for the work Plaintiff had completed." And the court concluded, "[t]he undisputed evidence shows Chase fulfilled all of its obligations under the Construction Loan Agreement." We read the record differently.

To begin with, this was not specified as an undisputed fact in Chase's moving papers, and Jolley did not admit any such fact as undisputed. It cannot be said that the undisputed facts show no controversy on this point.

Jolley contends "Chase . . . had a direct continuing responsibility to provide necessary funding to see that the project was finished . . . ." We understand this to mean that Jolley believes Chase was obligated to disburse, but failed to disburse, additional funds under his preexisting agreement with WaMu. The fact that Thorne may have believed the loan had been fully funded by WaMu prior to the receivership (if his statement is properly so construed) does not bind Jolley to that same conclusion.

Turning to the paperwork, Thorne's memorandum to WaMu in approximately September 2006 recommended a modified loan amount of $2,485,000. As far as we can tell, the amount actually disbursed as of September 25,

2008, was $2,426,650. This also suggests that further disbursements may have been due under the modified agreement. We are also not able to say with confidence that the dispute about the $350,000 that Thorne found to be "in limbo" was ever resolved. In sum, there appear to be disputed facts concerning whether WaMu, succeeded by Chase, ever fully funded the loan, factual disputes relating to whether the lender's obligations under the modified loan agreement ever were fulfilled.

Chase also argues it was under no obligation to disburse further funds or to roll over the construction loan because Jolley was in default on the loan payments beginning in December 2008. True, the loan contract conditioned the loan rollover provision on the borrower's compliance with the terms of the loan agreement. But there was a two-month period postreceivership—and prior to Jolley's default—during which it seems possible that funds were due to be disbursed, at least under Jolley's interpretation of the loan agreement.

Jolley also argues that the frequent reassurances by North that a modification was forthcoming induced him to rely, and as a result he "borrowed from friends and family to finish the construction." The effect of this is a triable issue of fact whether Chase has potential liability for its own conduct under a theory of promissory estoppel.

■ " 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 6 [151 Cal.Rptr. 323, 587 P.2d 1136].) The elements of promissory estoppel are: " ' "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." ' " (*Joffe v. City of Huntington Park* (2011) 201 Cal.App.4th 492, 513 [134 Cal.Rptr.3d 868].)

### C. *The Fourth Cause of Action, for Negligence*

The trial court granted summary adjudication on the fourth cause of action, for negligence, essentially finding no duty. The order read as follows: " 'Under California law, a lender does not owe a borrower or third party any duties beyond those expressed in the loan agreement, except those imposed due to special circumstance.' (*Sipe v. Countrywide Bank*[, *supra*,] 690 F.Supp.2d 1141, 1153, citing *Nymark v. Heart Fed. Savings & Loan Assn.*[, *supra*,] 231 Cal.App.3d 1089, 1096.)" We conclude there was a triable issue of material fact as to a duty of care to Jolley, which potentially makes Chase liable for its own negligence.

■ We acknowledge that we deal with an ordinary duty of reasonable care, not a fiduciary duty. We further acknowledge the frequent observation that lenders and borrowers operate at arm's length. (*Oaks Management Corporation v. Superior Court* (2006) 145 Cal.App.4th 453, 466–467 [51 Cal.Rptr.3d 561]; *Nymark v. Heart Fed. Savings & Loan Assn., supra*, 231 Cal.App.3d at p. 1093 (*Nymark*).) And we finally acknowledge that "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark, supra*, 231 Cal.App.3d at p. 1096; see *Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn.* (1975) 52 Cal.App.3d 484, 488, 489 [125 Cal.Rptr. 549]; *Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 206 [147 Cal.Rptr.3d 41].)

Such "general rule" has often been repeated, including in federal cases involving the takeover by Chase of WaMu's loans[12] and cases decided in the context of loan modification applications.[13] It was primarily on the basis of this general rule that the trial court below, without further analysis, granted summary adjudication of the negligence claim. And Chase relies upon such general rule here, contending it owed Jolley no duty of care. Such reliance is misplaced.

■ When considered in full context, the cases show the question is not subject to black-and-white analysis—and not easily decided on the "general rule." We conclude here, where there was an ongoing dispute about WaMu's performance of the construction loan contract, where that dispute appears to have bridged the FDIC's receivership and Chase's acquisition of the construction loan, and where specific representations were made by a Chase representative as to the likelihood of a loan modification, a cause of action for negligence has been stated that cannot be properly resolved based on lack of duty alone.

---

[12] *Rosenfeld v. JPMorgan Chase Bank, N.A., supra*, 732 F.Supp.2d at page 969 (claim for breach of fiduciary duty); *Argueta v. J.P. Morgan Chase* (E.D.Cal., June 30, 2011, No. CIV. 2:11-441 WBS GGH) 2011 U.S.Dist. Lexis 70756, page *12; *Sullivan v. JP Morgan Chase Bank, NA* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094 ("Plaintiffs' allegations that Defendant misrepresented to them that a permanent loan modification would be put into place are insufficient to form the basis of a negligence claim.").

[13] *Becker v. Wells Fargo Bank, N.A., Inc.* (E.D.Cal., Mar. 22, 2011, No. 2:10-cv-02799 LKK KJN PS) 2011 U.S.Dist. Lexis 29687, pages *67–*71 (allegations about loan modification application process did not give rise to duty); *Dooms v. Federal Home Loan Mortgage Corp.* (E.D.Cal., Mar. 31, 2011, No. CV F 11-0352 LJO DLB) 2011 U.S.Dist. Lexis 38550, pages *25–*28; *DeLeon v. Wells Fargo Bank, N.A.* (N.D.Cal., Oct. 22, 2010, No. 10-CV-01390-LHK) 2010 U.S.Dist. Lexis 112941, page *12 (defendant did not have a duty "to complete the loan modification process").

In *Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 856–858 [73 Cal.Rptr. 369, 447 P.2d 609] (*Connor*), a lender was involved in developing tract housing which proved to be faulty because the builders poured slab foundations on adobe soil, and the foundations cracked in subsequent rainstorms. (*Id.* at pp. 856–857.) The lender provided the money for the purchase of the land and for construction loans, and ultimately offered home buyers long-term loans on the homes. (*Id.* at p. 858.) The Supreme Court held the bank was not liable as a joint venturer (*id.* at pp. 862–863), but further held that its role as "an active participant in a home construction enterprise" imposed upon it a duty of ordinary care to the purchasers of the homes (*id.* at p. 864)—a holding reached by applying the six factors identified in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16] (the *Biakanja* factors)[14] (*Connor, supra,* 69 Cal.2d at p. 865).

Perhaps the *Biakanja* factors must be applied here too. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) But even if not, they are certainly appropriate for consideration, which consideration compels a conclusion for Jolley.

The *Biakanja* factors are six nonexhaustive factors: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. (*Biakanja v. Irving, supra,* 49 Cal.2d at p. 650.)

We begin by identifying the specific conduct by Chase that Jolley claims was negligent so as to limit our analysis "to the specific action the plaintiff claims the particular [defendant] had a duty to undertake in the particular case." (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 280 [12 Cal.Rptr.3d 846].) As we see it, Jolley claims Chase had an obligation to investigate the history of the loan and to make additional disbursements, to review his loan modification request in good faith, and to conform to standards of conduct in the industry to protect him against further losses associated with the loan. Chase allegedly acted unreasonably by failing to review Jolley's request for a loan modification in good faith, having decided in advance it would extend no further monies in connection with

---

[14] *Connor* held the lender was liable liability to the homeowners who bought into the housing tract. The Legislature subsequently enacted Civil Code section 3434 to restrict such liability, and to that extent *Connor* has been superseded by statute. (*Anthony v. Kelsey-Hayes Co.* (1972) 25 Cal.App.3d 442, 454, fn. 5 [102 Cal.Rptr. 113].)

WaMu's loans.[15] Jolley also complains about specific misstatements, false assurances given by some Chase personnel about the prospects for a loan modification, while different personnel at Chase—the actual decision makers—were bent on foreclosure.

The first factor, the extent to which the transaction was intended to affect the plaintiff, hardly needs discussion. Jolley was the person in direct negotiation, and contractual privity, with the loan originator (WaMu), from which Chase took over. Jolley specifically brought to Chase's attention his dissatisfaction with WaMu's funding of the loan. To the extent Chase undertook a reassessment of the propriety of past disbursements, it obviously did so for Jolley's benefit. And North's representations were made directly to Jolley, and were certainly likely to, if not intended to, affect his decisionmaking.

Likewise, it was certainly foreseeable that harm to Jolley could ensue in the event of Chase's negligence. Jolley began missing payments shortly after Chase bought WaMu's assets. That his credit rating would be adversely affected if Chase failed to negotiate with him in good faith was foreseeable, making it more difficult for him to secure alternative financing to cure the default. Given North's encouragement, it was also foreseeable that Jolley would sink more of his own money into the project, thereby suffering further injury.

There is also no doubt that Jolley was in fact injured. He invested funds borrowed from other sources to finish construction on the property shortly before foreclosure proceedings were initiated. As to the closeness of the connection between Chase's acts and Jolley's injury, the upbeat prediction of the availability of a loan modification and the rollover of the loan into a conventional mortgage was almost certainly a primary factor in causing this particular injury.

While it is not possible to tell at this point how blameworthy Chase's conduct may prove to be, this is not a case such as *Nymark*, where the borrower was in a better position to protect his own interests. To the contrary, Jolley's ability to protect his own interests in the loan modification process was practically nil. Chase held all the cards. The fact that Chase benefited from prolonging the loan renegotiation period and encouraging Jolley to

---

[15] We agree with Chase that no admissible evidence was submitted to support the assertion that Chase had decided in advance not to further fund any WaMu loans. The only evidence on this point was Thorne's declaration, which lacked foundation. However, regardless whether the decision was made in advance, if it were made without due care to avoid further injury to Jolley, then Chase is potentially liable for its own negligence.

complete construction certainly lends itself to a blameworthy interpretation. And a fair reading of the evidence here includes that Jolley was subjected to "dual tracking," which as discussed below has now been made illegal, illegality that tends to reinforce the view that Chase's conduct was blameworthy.

■ The policy of preventing future harm also favors imposing a duty of care on an entity in Chase's position. When a bank acquires from the FDIC a loan from a failed bank, part of what it acquires is the history of the loan. Even if acquiring banks are not liable for breaches, fraud, or negligence of the failed bank under their purchase and assumption agreements—an issue we do not decide—simple good business practices dictate that they take into account the position in which the borrower has been placed prior to their acquisition of the loan. Where there is a long-running dispute whether the failed bank properly disbursed monies due under the loan, the acquiring bank owes a duty of care to investigate the history of the loan and take that into account in negotiating with the borrower for a loan modification. Particularly so here.

We note that we deal with a construction loan, not a residential home loan where, save for possible loan servicing issues, the relationship ends when the loan is funded. By contrast, in a construction loan the relationship between lender and borrower is ongoing, in the sense that the parties are working together over a period of time, with disbursements made throughout the construction period, depending upon the state of progress towards completion.[16] We see no reason why a negligent failure to fund a construction loan, or negligent delays in doing so, would not be subject to the same standard of care.

Even when the lender is acting as a conventional lender, the no-duty rule is only a general rule. (*Osei v. Countrywide Home Loans* (E.D.Cal. 2010) 692 F.Supp.2d 1240, 1249.) As a recent federal case put it: "*Nymark* does not support the sweeping conclusion that a lender never owes a duty of care to a borrower. Rather, the *Nymark* court explained that the question of whether a lender owes such a duty requires 'the balancing of [the "*Biakanja* factors"] . . . .' " (*Newson v. Countrywide Home Loans, Inc.* (N.D.Cal., Nov. 30, 2010, No. C 09-5288 SBA) 2010 U.S.Dist. Lexis 126383, p. *15, italics added.) Or, in the words of an even more recent case, in each case where the

---

[16] Such a loan more readily gives rise to a cause of action for negligence in that contractual disbursements must be made with due care. "A lender that enters into a loan agreement to disburse the loan funds according to the terms of the loan documents, assumes a duty of care to act reasonably to abstain from injuring the borrower by its disbursal of funds. A lender may be liable to the borrower who is damaged as a result of the lender's negligent disbursal of the loan funds." (12 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 36:6, pp. 15–16 (rel. 12/2001), fns. omitted.)

general rule was applied to shield a lender from liability, "the plaintiff sought to impose upon the lender liability for activities *outside* the scope of the lender's conventional role in a loan transaction. It is against this attempt to expand lender liability (to that of, *e.g.*, an investment advisor or construction manager) that the court in *Nymark* found a financial institution owes no duty of care to a borrower when its involvement in the loan transaction 'does not exceed the scope of its conventional role as a mere lender of money.' *Nymark*, 231 Cal.App.3d at 1096. *Nymark* and the cases cited therein do not purport to state a legal principle that a lender can never be held liable for negligence in its handling of a loan transaction within its conventional role as a lender of money." (*Ottolini v. Bank of America* (N.D.Cal., Aug. 19, 2011, No. C-11-0477 EMC) 2011 U.S.Dist. Lexis 92900, p. *16.) We agree with these observations.

Chase relies upon the historical truism that a bank as lender is entitled to pursue its own economic interest in dealing with a borrower, citing *Kruse v. Bank of America, supra*, 202 Cal.App.3d at p. 67. We live, however, in a world dramatically rocked in the past few years by lending practices perhaps too much colored by shortsighted self-interest. We have experienced not only an alarming surge in the number of bank failures, but the collapse of the housing market, an avalanche of foreclosures,[17] and related costs borne by all of society.[18] There is, to be sure, blame enough to go around. And banks are hardly to be excluded.

---

[17] We quote the California Legislature: ". . . California is still reeling from the economic impacts of a wave of residential property foreclosures that began in 2007. From 2007 to 2011 alone, there were over 900,000 completed foreclosure sales. In 2011, 38 of the top 100 hardest hit ZIP Codes in the nation were in California, and the current wave of foreclosures continues apace. All of this foreclosure activity has adversely affected property values and resulted in less money for schools, public safety, and other public services. In addition, according to the Urban Institute, every foreclosure imposes significant costs on local governments, including an estimated nineteen thousand two hundred twenty-nine dollars ($19,229) in local government costs. And the foreclosure crisis is not over; there remain more than two million 'underwater' mortgages in California.

". . . It is essential to the economic health of this state to mitigate the negative effects on the state and local economies and the housing market that are the result of continued foreclosures by modifying the foreclosure process to ensure that borrowers who may qualify for a foreclosure alternative are considered for, and have a meaningful opportunity to obtain, available loss mitigation options. These changes to the state's foreclosure process are essential to ensure that the current crisis is not worsened by unnecessarily adding foreclosed properties to the market when an alternative to foreclosure may be available. Avoiding foreclosure, where possible, will help stabilize the state's housing market and avoid the substantial, corresponding negative effects of foreclosures on families, communities, and the state and local economy." (Assem. Bill No. 278 (2011–2012 Reg. Sess.) § 1 (Assembly Bill No. 278).)

[18] The legislative history of Assembly Bill No. 278 recognized extensive " 'spillover' costs" of "the foreclosure epidemic": "By some estimates the foreclosure crisis will strip neighboring homeowners of $1.9 trillion in equity as foreclosures drain value from homes located near foreclosed properties by 2012. . . . Meanwhile, state and local governments continue to be hit hard by declining tax revenues coupled with increased demand for social services. In fact, the

■ Due to the ongoing financial crisis, the federal government has adopted a voluntary incentive-based program designed to encourage lenders and borrowers to work together in the event of the borrower's default, by establishing a home loan modification program. (See U.S. Dept. Treasury, Supplemental Directive Nò. 09-01 (Apr. 6, 2009.) Similarly, the California Legislature has expressed a strong preference for fostering more cooperative relations between lenders and borrowers who are at risk of foreclosure, so that homes will not be lost.[19] (Civ. Code, §§ 2923.5, 2923.6.) These provisions, enacted in 2008, require lenders to negotiate with borrowers in default to seek loss mitigation solutions. As discussed hereafter, existing law will soon be supplemented by amendments enacted as part of the "California Homeowner Bill of Rights." (Assem. Bill No. 278; Sen. Bill No. 900 (2011–2012 Reg. Sess.).)

■ Granted, these ameliorative efforts have been directed primarily at aiding resident homeowners at risk of losing their homes. (Civ. Code, § 2923.5, subd. (f); Assem. Bill No. 278, § 18, adding Civ. Code, § 2924.15.) We also understand there is no express duty on a lender's part to grant a modification under state or federal loan modification statutes. And until the new legislation takes effect, no private right of action for damages is granted under the statutes. (See *Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1616 [126 Cal.Rptr.3d 174]; *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 214 [110 Cal.Rptr.3d 201]; *Pantoja v. Countrywide Home Loans, Inc.* (N.D.Cal. 2009) 640 F.Supp.2d 1177, 1188.) We do not cite any of these legislative measures in reliance upon their provisions, nor do we suggest their provisions were violated in the present case. Rather, we refer to the existence—and recent strengthening—of these legislative measures because they demonstrate a rising trend to require lenders to deal reasonably with borrowers in default to try to effectuate a workable loan modification. In short, these measures indicate that courts should not rely mechanically on the "general rule" that lenders owe no duty of care to their borrowers.

---

Urban Institute estimates that a single foreclosure costs $79,443 after aggregating the costs borne by financial institutions, investors, the homeowner, their neighbors, and local governments." (Sen. Rules Com., Off. of Sen. Floor Analyses, Conf. Rep. on Assem. Bill No. 278, as amended June 27, 2012, pp. 14–15.)

[19] "When a borrower is in danger of defaulting, a commonsense approach under a traditional mortgage would be for the lender and borrower to mutually agree to modify the terms of the loan . . . . [¶] Despite the apparent mutual interest of loan holders and borrowers, many distressed homeowners report obstacles when trying to obtain a loan modification or short-sale approval. (See e.g. 'Loan Modifications Elude Local Homeowners,' *Sacramento Bee*, January 17, 2011.) . . . . [¶] . . . [¶] Some analysts and leading economists have cited a failure by banks to provide loan modifications as a single reason that the foreclosure crisis continues to drag on." (Sen. Rules Com., Off. of Sen. Floor Analyses, Conf. Rep. on Assem. Bill No. 278, as amended June 27, 2012, pp. 15–16.)

Existing state statutes relating to loan modifications will soon be supplemented by stiffer restrictions on the conduct of lenders and loan servicers during the loan modification process. Even as this case has been pending before us, on July 2, 2012, the California Legislature passed Assembly Bill No. 278 and Senate Bill No. 900 (2011–2012 Reg. Sess.), which have since been signed into law by the Governor. These provisions address more pointedly the foreclosure crisis in our state through even greater encouragement to lenders and loan servicers to engage in good faith loan modification efforts.

One of the targets of the legislation is a practice that has come to be known as "dual tracking." "Dual tracking refers to a common bank tactic. When a borrower in default seeks a loan modification, the institution often continues to pursue foreclosure at the same time." (Lazo, *Banks are foreclosing while homeowners pursue loan modifications*, L.A. Times (Apr. 14, 2011); see Sen. Floor Analyses, Conf. Rep. on Assem. Bill No. 278, as amended June 27, 2012, p. 3.) The result is that the borrower does not know where he or she stands, and by the time foreclosure becomes the lender's clear choice, it is too late for the borrower to find options to avoid it. "Mortgage lenders call it 'dual tracking,' but for homeowners struggling to avoid foreclosure, it might go by another name: the double-cross."[20] (Lazo, *Banks are foreclosing*.) As we understand the pleadings and proof here, this is precisely one of Jolley's claims.[21]

The recent California legislation attempts over time to eliminate the practice of dual tracking and to ameliorate its effects, by requiring lenders and loan servicers to designate a "single point of contact" for each borrower in default. (See Assem. Bill No. 278, § 7 [amending Civ. Code, § 2923.6, subd. (c) (prohibiting dual tracking by higher volume lenders and mortgage servicers)]; Assem. Bill No. 278, § 9 [adding Civ. Code, § 2923.7 (single point of contact)]; Assem. Bill No. 278, § 15 [adding Civ. Code, § 2924.11 (prohibiting dual tracking by all lenders and mortgage servicers effective Jan. 1, 2018)].) The single point of contact provision, like the dual-tracking

---

[20] According to the legislative history, " 'borrowers can find their loss-mitigation options curtailed because of dual-track processes that result in foreclosures even when a borrower has been approved for a loan modification.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, Conf. Rep. on Assem. Bill No. 278, as amended June 27, 2012, p. 18.)

[21] Jolley alleged, inter alia, that he was told a "workable loan modification was in the works" and "[f]oreclosure proceedings would be suspended pending the outcome of the loan modification process." He further alleged the true facts were that "a loan modification was not in the works" and "foreclosure proceedings were ongoing." Beyond the mere allegations, Jolley testified that because of "inordinate delay" by Chase in responding to his initial contact regarding a loan modification, he "borrowed heavily from friends and family" to complete construction. And further, that had the loan modification been granted and the construction loan converted to a conventional loan, the permanent financing would have been at a "favorable rate," making the "payments substantially less" and he "could have afforded to pay them."

provision, is intended to prevent borrowers from being given the runaround, being told one thing by one bank employee while something entirely different is being pursued by another. Under the legislation, the single point of contact must be responsible for, among other things, "[h]aving access to current information and personnel sufficient to timely, accurately, and adequately inform the borrower of the current status of" his loan modification request and "[h]aving access to individuals with the ability and authority to stop foreclosure proceedings when necessary." (Assem. Bill No. 278, § 9 [adding Civ. Code, § 2923.7].)

The same legislation provides homeowners who are facing foreclosure or whose homes have actually been lost to foreclosure with a remedy if the lender or loan servicer materially violated the provisions of the act intentionally, recklessly, or through "willful misconduct" (Assem. Bill No. 278, §§ 16, 17 [adding Civ. Code, § 2924.12]): those facing foreclosure may seek an injunction, while those who have lost their homes may seek treble actual damages or statutory damages of $50,000, whichever is greater.

Of course, these provisions do not apply to our case. The question for our purposes is whether the new legislation sets forth policy considerations that should affect the assessment whether a duty of care was owed to Jolley at that time. We think it does.

We find support for our conclusion in recent federal district court cases that have found a duty of care in particular circumstances surrounding loan modification negotiations. *Ansanelli v. JP Morgan Chase Bank, N.A.* (N.D.Cal., Mar. 28, 2011, No. C 10-03892 WHA) 2011 U.S.Dist. Lexis 32350, page *21, is illustrative. There, the court found a duty of care had properly been pleaded in a negligence action where the bank offered the plaintiffs a trial loan modification plan, then reneged on a promise to modify the loan. The bank reported the loan as past due despite the fact that the plaintiffs had made proper payments under the trial modification, thereby damaging their credit rating. (*Id.* at pp. *2–*3.)

Similarly, *Robinson v. Bank of America* (N.D.Cal., May 29, 2012, No. 12-CV-00494-RMW) 2012 U.S.Dist. Lexis 74212, page *21, decided on a motion to dismiss, held that a bank went beyond its role as a "silent" lender in its dealings with the plaintiff during loan modification negotiations. There, the bank was "alleged to have executed and breached the modification agreement, then engaged in a series of contradictory and somewhat misleading communications with plaintiff—in person, in writing, and by phone— regarding the status of his loan. Under such circumstances, it was entirely foreseeable that [the bank's] conduct could result in damage to plaintiff's credit rating or a decrease in the value of his home." (*Ibid.*; see *Crilley v. Bank*

*of America, N.A.* (D.Hawaii, Apr. 26, 2012, No. 12-00081 LEK-BMK) 2012 U.S.Dist. Lexis 58469, pp. *5–*12, *26 [duty of care owed where plaintiff and bank engaged in substantial negotiations regarding loan modification, finding potential liability based in part on "delays in the loan modification process"]; *Watkinson v. MortgageIT, Inc.* (S.D.Cal., June 1, 2010, No. 10-CV-327-IEG (BLM)) 2010 U.S.Dist. Lexis 53540, pp. *23–*24 [duty of care found where bank knowingly misstated borrower's income and value of property on loan application, and where borrower sought but was denied a loan modification]; *Garcia v. Ocwen Loan Servicing, LLC* (N.D.Cal., May 6, 2010, No. C-10-0290 PVT) 2010 U.S.Dist. Lexis 45375, pp. *7–*11 [plaintiff's allegations about loan modification application process sufficiently pled a duty under *Biakanja* factors]; but see *Ottolini v. Bank of America, supra,* 2011 U.S.Dist. Lexis 92900 at pp. *18–*19 [distinguishing *Ansanelli, supra,* 2011 U.S.Dist. Lexis 32350 where "the application for loan modification had not progressed to a concrete stage and . . . there is no indication of the likelihood that such an application would have been granted . . ."].)

██ We conclude that the determination that Chase owed no duty to. Jolley was error. Thus, the summary adjudication on the negligence cause of action must be reversed, as it was in *Laabs v. Southern California Edison Co.* (2009) 175 Cal.App.4th 1260, 1269 [97 Cal.Rptr.3d 241] where the Court of Appeal held as follows: "We note, however, that we do not hold that SCE owed Laabs a duty of care as a matter of law; rather, we hold that triable issues of fact exist as to the relevant considerations underlying duty in this case, and that SCE failed to establish that it was entitled to judgment as a matter of law. While we recognize that the issue of duty is a matter for the trial court, it is nonetheless a factually oriented inquiry. As stated in *Burger v. Pond* (1990) 224 Cal.App.3d 597, 603 [273 Cal.Rptr. 709], ' "Foreseeability" and "policy considerations" are not determined in a vacuum, but rather depend . . . upon the particular circumstances in which the purported wrongful conduct occurred.' " (Italics omitted.)

### D. *The Fifth Cause of Action, Violation of Business and Professions Code Section 17200*

Jolley claims Chase violated the unfair competition law (UCL) (Bus. & Prof. Code, § 17200), but does not specify which acts violated that provision or the nature of the violation. Again, he bases his theory of liability on the premise that Chase "must stand squarely in the shoes of WaMu for all of its criminal, fraudulent, negligent and otherwise 'unfair' practices perpetrated against Appellant and the world economy . . . ." He further claims, without specificity, that Chase is equally liable for such wrongdoing on its own part.

██ The UCL is broad in scope, prohibiting any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading

advertising" (Bus. & Prof. Code, § 17200), as well as any act specifically prohibited under Business and Professions Code section 17500 et seq. The statute is meant to forbid not only anti-competitive practices but also " ' " 'the right of the *public* to protection from fraud and deceit.' " ' " (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660].) An "unlawful" activity is any business activity that is forbidden by law. (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 838–839 [33 Cal.Rptr.2d 438].) A "fraudulent" activity includes any act or practice likely to deceive the public, even if no one is actually deceived. (*Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d at p. 211.)

There is a split of authority on what constitutes an "unfair" practice. (*Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1260–1261 [39 Cal.Rptr.3d 634].) Some cases hold an "unfair" practice is one that offends established public policy, that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, or that has an impact on the victim that outweighs the defendant's reasons, justifications, and motives for the practice. (*Pastoria v. Nationwide Ins.* (2003) 112 Cal.App.4th 1490, 1498 [6 Cal.Rptr.3d 148]; *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718–719 [113 Cal.Rptr.2d 399]; *Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [58 Cal.Rptr.2d 89].) Others, including at least one from our district (*Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 853–854 [128 Cal.Rptr.2d 389]), hold that the public policy which is a predicate to a claim under the "unfair" prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions. (See *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 938 [134 Cal.Rptr.2d 101].) Either way, unfairness is independently sufficient to state a claim under the statute. (*Allied Grape Growers v. Bronco Wine Co.* (1988) 203 Cal.App.3d 432, 451 [249 Cal.Rptr. 872]; see *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] [indicating that conduct may be "unfair" without being "unlawful"].)

Granting summary adjudication on the fifth cause of action, the trial court concluded that "the undisputed evidence shows that Chase has not violated any law, or committed a deceptive or fraudulent act/misrepresentation to fall within § 17200." There was no reference to "unfair" conduct.

With respect to Chase's own conduct, we have already decided that North's statements may be construed as misstatements of fact, with possible liability for such conduct left to the trier of fact. That raises a triable issue as to "fraudulent." We have also concluded that dual tracking has been alleged and supported by Jolley's declaration. And while dual tracking may not have

been forbidden by statute at the time, the new legislation and its legislative history may still contribute to its being considered "unfair" for purposes of the UCL. Summary adjudication of Jolley's fifth cause of action was improper.

### E. *The Eighth Cause of Action, for Reformation*

 Civil Code section 3399 provides the authority upon which a contract may be reformed: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised, on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." (See generally 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 806, pp. 221–222.)

The "intention of the parties," as stated in Civil Code section 3399, refers to "a single intention which is entertained by both parties." (*Shupe v. Nelson* (1967) 254 Cal.App.2d 693, 700 [62 Cal.Rptr. 352].) "The essential purpose of reformation is to reflect the intent of the parties." (*Jones v. First American Title Ins. Co.* (2003) 107 Cal.App.4th 381, 389 [131 Cal.Rptr.2d 859].) " 'Although a court of equity may revise a written instrument to make it conform to the real agreement, it has no power to make a new contract for the parties . . . .' " (*American Home Ins. Co. v. Travelers Indemnity Co.* (1981) 122 Cal.App.3d 951, 963 [175 Cal.Rptr. 826].)

The facts are undisputed that Chase and Jolley never signed a contract to modify the WaMu loan or reached agreement on any specific terms for a loan modification. However, Jolley pled, and testified, that the original loan agreement with WaMu was marred by either fraud or mutual mistake in that he was promised that prepaid construction costs would be reimbursed to him. Jolley's basis for this claim is a written document entitled "Construction Items Prepaid at Closing" signed in December 2005, before the actual loan was finalized. Jolley evidently wishes to reform the written agreement to incorporate this reimbursement provision, and there is a triable issue of fact whether he can. Summary adjudication on this cause of action must be reversed. (See *Jensen v. Quality Loan Service Corp* (E.D.Cal. 2010) 702 F.Supp.2d 1183, 1197, fn. 5 [Chase may be subject to reformation of WaMu's loan based on its acquisition of the loan].)

### 4. Summary Adjudication Was Properly Granted on the Sixth and Seventh Causes of Action

### A. The Sixth Cause of Action, for Declaratory Relief

■ Code of Civil Procedure section 1060 authorizes actions for declaratory relief under a "written instrument" or "contract." Declaratory relief generally operates prospectively to declare future rights, rather than to redress past wrongs. (*Babb v. Superior Court* (1971) 3 Cal.3d 841, 848 [92 Cal.Rptr. 179, 479 P.2d 379]; *Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1403 [120 Cal.Rptr.2d 392] (*Gafcon*).) It serves to set controversies at rest before they lead to repudiation of obligations, invasion of rights or commission of wrongs. In short, the remedy is to be used in the interests of preventive justice, to declare rights rather than execute them. (*Ibid.*)

"To qualify for declaratory relief, [a party] would have to demonstrate its action presented two essential elements: '(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [the party's] rights or obligations . . . .' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582 [120 Cal.Rptr.3d 665].)

The trial court did not state any reason for granting summary adjudication on the declaratory relief cause of action, but simply recited in conclusory fashion that Jolley was not entitled to such relief, citing *Gafcon, supra,* 98 Cal.App.4th at pages 1401–1402. Citation of that case suggests the ruling was premised on the notion that Jolley has, if anything, a fully matured cause of action against Chase, and not one appropriate for declaratory relief. With this we agree.

The undisputed facts show that loan modification negotiations did not result in a written instrument or contract under which the parties' rights need to be declared. While there may be a controversy about past conduct, we see no reason why money damages would not be an adequate remedy. (See *Gafcon, supra,* 98 Cal.App.4th at pp. 1403–1404.) Moreover, this cause of action is redundant of Jolley's other claims, and declaratory relief may be denied "where its declaration or determination is not necessary or proper at the time under all the circumstances." (Code Civ. Proc., § 1061.) Where, as here, Jolley has a fully matured cause of action for money, he must seek

damages, and not pursue a declaratory relief claim. (*Gafcon, supra*, 98 Cal.App.4th at pp. 1403–1404; *Jackson v. Teachers Ins. Co.* (1973) 30 Cal.App.3d 341, 344 [106 Cal.Rptr. 208].) Summary adjudication of the sixth cause of action was proper.

### B. *The Seventh Cause of Action, for Accounting*

■ An action for an accounting may be brought to compel the defendant to account to the plaintiff for money or property (1) where a fiduciary relationship exists between the parties, or (2) where, even though no fiduciary relationship exists, the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable. (5 Witkin, Cal. Procedure, *supra*, Pleading, § 819, p. 236.) "A cause of action for an accounting requires a showing that a relationship exists between the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff that can only be ascertained by an accounting." (*Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 179 [92 Cal.Rptr.3d 696].)

Chase contends that Jolley's cause of action for an accounting is subject to summary adjudication because Jolley makes no claim that money was due him under the contract with WaMu, and no independent contract was ever entered into with Chase. The trial court found "no evidence that Defendants owe [Jolley] any money under the Construction Loan Agreement that requires an accounting." It further concluded, "[Jolley] makes no effort to identify where in the payment record he is owed any money" with the consequence that "no grounds for an accounting exist." Jolley's efforts aside, there are disputed facts with respect to whether the modified construction loan had been fully funded prior to Chase's acquisition of the loan.

That said, we find an accounting remedy uncalled for in this case. There was no fiduciary relationship between the parties and we detect no proof of any other special relationship that would give rise to an accounting remedy, nor a specification of amounts due so complicated that it cannot be determined in a legal action for damages. Summary adjudication of the seventh cause of action was proper.

### 5. *Summary Judgment for CRC Was Proper*

CRC acted solely as trustee in the present case. None of Jolley's allegations of wrongdoing pertains to CRC, and no factual support has been offered with respect to any claim against it. The summary judgment is therefore affirmed insofar as it is in favor of CRC. (See *Moncrief v. Washington Mutual, supra*, 2010 U.S.Dist. Lexis 64100 at p. *8.)

## DISPOSITION

The summary judgment in favor of CRC is affirmed, as are the summary adjudications in favor of Chase of the sixth and seventh causes of action. The summary judgment for Chase is reversed. Both sides shall bear their respective costs on appeal.

Haerle, Acting P. J., and Lambden, J., concurred.

A petition for a rehearing was denied March 7, 2013, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied May 22, 2013, S209554. Kennard, J., did not participate therein.