Filed 8/27/15  Sorokko v. Bank of America CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SERGE SOROKKO,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>BANK OF AMERICA, N.A., et al.,<br><br>　　　Defendants and Respondents. | A140544<br><br>(Marin County<br>Super. Ct. No. CIV 12 03368) |

In 2005, Serge Sorokko took out an adjustable rate mortgage on his home.  Bank of America, N.A. (BANA) serviced Sorokko's loan.  He defaulted in 2009.  After approximately three years of unsuccessful inquiries about modification of his loan's terms, Sorokko learned that BANA had set a foreclosure date and loan modification was no longer an option.  He brought this action to prevent foreclosure and obtain other forms of relief.  The trial court sustained BANA's demurrers in their entirety and we affirm.

## I.　BACKGROUND

"Because the function of a demurrer is not to test the truth or accuracy of the facts alleged in the complaint, we assume the truth of all properly pleaded factual allegations. [Citation.]  Whether the plaintiff will be able to prove these allegations is not relevant; our focus is on the *legal* sufficiency of the complaint." (*Los Altos Golf & Country Club v. County of Santa Clara* (2008) 165 Cal.App.4th 198, 203.)

1

A.	*Loan Modification Negotiations*

In 2005, Sorokko closed on a mortgage loan (Loan) secured by his Mill Valley home.  The Loan was later acquired by BANA.  Sorokko stopped making payments on the Loan in about July 2009.

1.	*2009 Communications with BANA*

In October 2009, Sorokko received from BANA an "Important Message About Your Loan," which offered him an opportunity to "save your home" via alternatives to foreclosure that included "Loan Modification, Repayment Arrangements, Deed-in-Lieu, Short Sale/Payoff, [and] Full Reinstatement."  Sorokko called the telephone number provided in the message several times and "was promised by [BANA's] representatives in departments variously titled 'foreclosure avoidance,' 'modification department,' 'customer assistance,' 'retention division,' 'loss mitigation,' and four separate 'single point(s) of contact' that he would receive advice of available options . . . offered by BANA to enable [Sorokko] to avoid foreclosure."  Sorokko "clearly and repeatedly informed [BANA representatives] that he could not make the full payment due from him at that time. . . . [¶] . . . [He] was specifically advised by these same representatives that BANA had, 'for you [Sorokko],' 'many options besides paying your current loan according to its current terms' . . . .  BANA's representatives expressly promised [Sorokko] that they would help him to obtain the benefits of these various alternatives[,] . . . and that they had 'no desire or intention of foreclosing,' and [Sorokko] believed them."  Similar representations were made to Sorokko's counsel.

Sorokko alleged in his second amended complaint, "In conversation with BANA's representatives [(apparently in 2009)], [Sorokko] clearly and repeatedly informed [BANA representatives] that . . . he was faced with the terrible choice of letting his home be foreclosed upon or filing for bankruptcy protection . . . .  When [Sorokko] so much as mentioned bankruptcy, BANA's representatives on at least two different occasions told him, in words surprisingly similar one to the other, . . . [paraphrasing]:  '. . . Bankruptcy should be your last resort.  We do not want our borrowers to have to resort to bankruptcy to save their homes.  Before you take such a drastic step you should explore with us our

2

alternatives for struggling homeowners such as yourself.' " These alternatives were alleged to have "expressly includ[ed] . . . loan modification."

On appeal, Sorokko represents that his complaint can be amended to add the following allegations: "Before I retained counsel in late 2009 I [told] a woman at BANA . . . [I] was seeking ways to retain my home short of filing for bankruptcy, as had been recommended to me as my only alternative. She said, in words simple, clear and close to this paraphrase: 'We [(BANA)] have multiple programs to help you save your home and avoid foreclosure. You don't have to go bankrupt to save your home.' I said, in paraphrase: 'Are you sure you can find ways for me to avoid bankruptcy and save my home? This is my life we are talking about.' The woman said—and I believe I am quoting her here: 'Sir, forgive me for being blunt, but you are not the first, nor the last customer I have dealt with under similar circumstances, and all but one were able to save their property once loan modifications or refinancing was in place. The only one that didn't save it was the lady who filed for bankruptcy in the middle of the refi process, against my advice.' "

2.     *2010–2011 Communications with BANA*

In January 2010, Sorokko received a "Notice of Intent to Accelerate" from BANA, which specified full payment of the past due amount of $77,788.10 within 30 days as the only means of avoiding foreclosure. In January and February 2010, and again in June 2011, Sorokko and his attorney attempted to contact BANA to pursue other alternatives to foreclosure. They were unable to reach "live human beings with knowledge of the circumstances" of the Loan or authority to discuss the Loan, familiarity with alternatives previously promised to Sorokko, or the ability or willingness to refer them to others who could help. BANA allegedly "trained and charged its multiple single points of contact so that any one of them would promise that BANA would help [Sorokko], but the promised assistance was never intended by BANA to be provided by any of its employees, and one never encountered the promising employees again to confirm the promise or demand the performance. . . . The avenues BANA promised [Sorokko] were dead ends leading nowhere." In the second amended complaint, Sorokko

3

further alleged that BANA's failure to foreclose before 2012 confirmed his belief in the "vitality" of BANA's promises.

3.      *2012 Communications with BANA*

In March 2012, Sorokko received a "Notice of Default and Election to Sell Under Deed of Trust" from BANA. The notice stated that Sorokko could avoid foreclosure by contacting BANA's foreclosure department. Sorokko and his counsel made several calls to the designated telephone number, but reached people who had no record of Sorokko's previous inquiries. On June 27, Sorokko's attorney contacted "Josh," who said he was Sorokko's "single point of contact." Josh reported that no foreclosure date had been set and asked whether Sorokko would like to be considered for loan modification. When the attorney expressed interest, Josh referred him to "foreclosure attorneys" at a different telephone number, which turned out to be an automated line. The automated message stated that no foreclosure sale date had been set for Sorokko's home, but when the attorney called the number again on July 5 he learned a sale had been scheduled for July 27.

On July 18, 2012, the attorney again called the number provided in the notice of default and spoke to "Shalika," who first said she was Sorokko's single point of contact but then said "Nadia," the "customer relations manager" for the Loan, was Sorokko's single point of contact. Nadia said that, because of the close date of the foreclosure sale, Sorokko's only option to avoid foreclosure was to pay the full amount due. Upon further inquiry, Nadia referred Sorokko's attorney to "foreclosure attorneys," again providing the number for the automated line. Sorokko was never able to reach a live person at that number.

On July 24, 2012, Sorokko sued BANA, seeking to enjoin foreclosure of his home, obtain an accounting and recover damages, among other forms of relief.

4.      *Reliance and Damages*

Sorokko allegedly lost or incurred the down payment, closing costs, brokerage fees and mortgage payments he made on the Loan, the cost of homeowner's insurance he paid on an "underwater" house, his positive credit rating, prepayment penalties, excessive

4

interest accumulation, attorney fees, pain and suffering, and emotional distress. Sorokko alleged he paid legal counsel to assist him in negotiating a loan modification to no avail, and he refrained from listing his house for a short sale, "thus losing three years of opportunity to unload the property and salvage and/or restore his credit rating, which is now in ruins . . . ."

Sorokko also refrained from filing for bankruptcy after spending money on a bankruptcy legal consultation, and he alleged that bankruptcy had since become untenable. "In the time since thus foreswearing from filing for bankruptcy protection, [Sorokko's] circumstances have materially changed. His secured debt to BANA has increased significantly by late fees as well as interest payments. His unsecured debt to others (which would have been easily discharged in bankruptcy) has been paid down in preparation for improving his chances to qualify for loan modification relief . . . ." Sorokko also made "permanent long-term forward-looking repairs and improvements to [his home] (including to the private road leading to it, to its foundation and to its kitchen)," and he "made significant changes to his company's business model for the purpose of enabling him to demonstrate to BANA in loan modification negotiations that he was qualified for a loan modification . . . ."

B.    *Trial Court Proceedings*

Sorokko's original causes of action included promissory estoppel, fraud and deceit, negligent misrepresentation, breach of fiduciary duty, negligence, and violation of the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.). As to all claims, the trial court sustained BANA's demurrer to the complaint with leave to amend. In his first amended complaint, Sorokko replaced his breach of fiduciary duty claim with a claim for breach of the implied covenant of good faith and fair dealing and otherwise renewed his prior claims. The court sustained BANA's demurrer to the first amended complaint and granted leave to amend as to the promissory estoppel cause of action only. Sorokko's second amended complaint raised a sole promissory estoppel claim; the court sustained BANA's demurrer to that claim without leave to amend. The court then entered judgment for BANA and this appeal followed.

5

## II.    DISCUSSION

A.    *Background*

Since 2007, California has experienced an "avalanche" of home foreclosures. (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 902 & fn. 17 (*Jolley*).) In 2008, the California Legislature took initial steps to protect homeowners from "skyrocketing residential property foreclosure rates" by passing the Perata Mortgage Relief Act.  (Stats. 2008, ch. 69, § 1, p. 224 [findings and declarations]; see *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 214.)  Among other things, the legislation, which became operative in relevant part in September 2008 (see Stats. 2008, ch. 69, § 10, p. 230), required that, before a notice of default may be filed, a lender contact the borrower in person or by phone to "assess" the borrower's financial situation and "explore options" to prevent foreclosure.  (Civ. Code, former § 2923.5, subd. (a)(2), added by Stats. 2008, ch. 69, § 2, p. 225.)[1]  The Legislature declared its intent that a lender[2] "offer the borrower a loan modification or workout plan if such a modification or plan is consistent with its contractual or other authority."  (§ 2923.6, subd. (b).)  However, "nothing in section 2923.5 . . . require[d] the lender to rewrite or modify the loan."  (*Mabry*, at p. 214.)  Similarly, the federal Troubled Asset Relief Program encouraged borrower-friendly loan servicing practices (the Home Affordable Modification Program), but the federal program also provided financial incentives for

---

[1] Undesignated statutory references are to the Civil Code.  Sorokko's mortgage fell within the class of mortgages covered by former section 2923.5.  (See former § 2923.5, subd. (i), added by Stats. 2008, ch. 69, § 2, p. 225 ["loans made from January 1, 2003, to December 31, 2007, inclusive, that are secured by residential real property and are for owner-occupied residences"]; see §§ 2923.5, subd. (f), 2924.15.)  Section 2923.5 was amended in immaterial ways in 2009.  (§ 2923.5, as amended by Stats. 2009, ch. 43, § 1, No. 5 West's Cal. Legis. Service, p. 2228.)

[2] The 2008 enactment referred to "the mortgagee, beneficiary, or authorized agent" and later amendments refer to "the mortgage loan servicer."  (See § 2923.5.)  Because the specific meaning of these terms is not directly at issue here and has not been briefed, we assume for purposes of argument that BANA falls within the relevant categories.  We use the general term "lender" to refer to BANA and similar defendants.

6

such practices and required lenders to offer loan modifications in certain circumstances.[3] (See *Bushell v. JPMorgan Chase Bank, N.A., supra,* 220 Cal.App.4th at pp. 921–923.)

A practice of "dual tracking" emerged:  " 'When a borrower in default seeks a loan modification, the institution often continues to pursue foreclosure at the same time.' [Citations.]  The result is that the borrower does not know where he or she stands, and by the time foreclosure becomes the lender's clear choice, it is too late for the borrower to find options to avoid it." (*Jolley, supra,* 213 Cal.App.4th at p. 904.)  In the federal Home Affordable Modification Program context, the Fourth District described a "well-established and predictable pattern.  A homeowner in distress because of the meltdown of the financial markets applies to a lender for mortgage relief.  The lender approves the homeowner's participation in a . . . program meant to lower mortgage payments and avoid foreclosure.  The homeowner tries to comply with the terms of the mortgage modification program.  He or she contacts the lender to make sure everything is proceeding according to plan and either receives assurances that it is or is passed from person to person, each of whom professes to know nothing about the loan in question or its modification; sometimes both.  Then the foreclosure notice is posted on the door, and the house is sold." (*Fleet v. Bank of America, N.A.* (2014) 229 Cal.App.4th 1403, 1405–1406.)

Partly in response to this practice, the California Legislature enacted the Homeowner Bill of Rights (HBOR) in 2012, effective January 1, 2013.[4] (*Alvarez v. BAC*

---

[3] Unlike the precatory provisions of section 2923.6, the lender " 'must offer' " the borrower a permanent loan modification under the Home Affordable Modification Program if the borrower meets the statutory qualifications and has complied with all requirements of a trial period plan.  (*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 924–925; cf. *Mabry v. Superior Court, supra,* 185 Cal.App.4th at p. 222 [former § 2923.6 "merely expresses the *hope* that lenders will offer loan modifications on certain terms"].)  This is because "[w]hen [a lender] received public tax dollars under the [federal] Troubled Asset Relief Program, it agreed to offer [trial period plans] and loan modifications under [the Home Affordable Modification Program] according to [regulations] . . . issued by the Department of the Treasury." (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 796–797.)

*Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 950 (*Alvarez*).) HBOR regulates dual tracking by prohibiting lenders from recording a notice of default or sale or conducting a trustee's sale if the borrower's loan modification application is still pending (§§ 2923.5, subd. (a)(1)(B), 2924.18, subd. (a)(1)), and in certain cases for 30 days after denial to allow the borrower time to appeal the denial. (§§ 2923.55, 2923.6, subds. (c)– (h).) Lenders are also required to designate a "single point of contact" for borrowers who request a foreclosure prevention alternative (§ 2923.7),[5] and to comply with other notice requirements when considering an application for a foreclosure prevention alternative (§§ 2924.9–2924.11). HBOR provides a private right of action to seek injunctive relief and damages or statutory penalties to enforce certain provisions (§§ 2924.12, 2924.19), but parties covered by and in compliance with the National Mortgage Settlement are shielded from liability for violations (§ 2924.12, subd. (g)).[6] HBOR "only provides

---

[4] The current HBOR provisions cited in this paragraph apply to "mortgages or deeds of trust secured by residential real property not exceeding 4 dwelling units that is owner-occupied . . . [and] those entities who conduct more than 175 foreclosure sales per year . . . ." (Legis. Counsel's Dig., Assem. Bill No. 278 (2011–2012 Reg. Sess.); Legis. Counsel's Dig., Sen. Bill No. 900 (2001–2012 Reg. Sess.).)

[5] HBOR requires lenders to provide borrowers with a single point of contact "responsible for doing all of the following: [¶] (1) Communicating the process by which a borrower may apply for an available foreclosure prevention alternative and the deadline for any required submissions to be considered for these options. [¶] (2) Coordinating receipt of all documents associated with available foreclosure prevention alternatives and notifying the borrower of any missing documents necessary to complete the application. [¶] (3) Having access to current information and personnel sufficient to timely, accurately, and adequately inform the borrower of the current status of the foreclosure prevention alternative. [¶] (4) Ensuring that a borrower is considered for all foreclosure prevention alternatives offered by, or through, the mortgage servicer, if any. [¶] (5) Having access to individuals with the ability and authority to stop foreclosure proceedings when necessary." (§ 2923.7, subd. (b).) "The single point of contact provision, like the dual-tracking provision, is intended to prevent borrowers from being given the runaround, being told one thing by one bank employee while something entirely different is being pursued by another." (*Jolley, supra,* 213 Cal.App.4th at pp. 904–905.)

[6] On April 4, 2012, BANA entered into the National Mortgage Settlement with the United States and attorneys general from several states including California. (See

procedural protections to foster alternatives to foreclosure; it does not entitle a borrower to a loan modification. [(§ 2923.4, subd. (a).)]" (*Penermon v. Wells Fargo Bank, N.A., supra,* 47 F.Supp.3d at p. 993.)

Courts have not been consistent in their approach to borrowers' civil claims arising from requests for loan modification. A clear split of authority exists as to whether lenders owe borrowers a duty of reasonable care in the loan modification context. Two opinions out of the First District hold or state in dicta that, in light of the developing crisis and legislative enactments such as HBOR, courts must recognize such a duty of care. (*Alvarez, supra,* 228 Cal.App.4th at pp. 944–952; *Jolley, supra,* 213 Cal.App.4th at pp. 899–901.) In *Lueras v. BAC Home Loans Servicing L.P.* (2013) 221 Cal.App.4th 49, 68 (*Lueras*), Division Three of the Fourth District, however, disagreed. All three cases begin their analysis with the "general rule" that lenders and borrowers operate at arms length, and that "a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Alvarez*, at p. 945; *Jolley*, at pp. 898, 901; *Lueras*, at p. 63.) The six factors set forth in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 are then applied to guide the duty of care analysis. (*Alvarez*, at pp. 948–949; *Jolley*, at pp. 899–901 [applying factors to construction loan modification], 901–906 [extending analysis to residential loan modification]; *Lueras*, at p. 67.) Different conclusions are reached, albeit on somewhat different facts.

No published California appellate case has since followed *Alvarez*, nor has any published California authority adopted the rationale of *Lueras*. Federal courts have similarly split on this issue. (See, e.g., *Meixner v. Wells Fargo Bank, N.A.* (E.D.Cal., Apr. 23, 2015, No. 2:14-cv-02143) 2015 U.S.Dist. Lexis 54206 [applying *Alvarez* to

---

*Jurewitz v. Bank of America, N.A.* (S.D.Cal. 2013) 938 F.Supp.2d 994, 997; *Penermon v. Wells Fargo Bank, N.A.* (N.D.Cal. 2014) 47 F.Supp.3d 982, 992, fn. 2.) This consent judgment requires BANA to comply with certain loan servicing standards including prohibitions on dual tracking and requirements for a single point of contact, but it is enforceable only by the parties to the judgment. (§ 2923.4, subd. (b); *Jurewitz*, at p. 998; *Penermon*, at pp. 992, 993, fns. 2, 4.)

conclude "that a lender owes a duty of care to the borrower when considering his loan modification application"]; *Carbajal v. Wells Fargo Bank, N.A.* (C.D.Cal., Apr. 10, 2015, No. CV 14-7851) 2015 U.S. Dist. Lexis 47918 [applying *Lueras* to conclude that "Wells Fargo was acting as a conventional lender of money when it accepted and considered applications seeking to modify Plaintiff's loan terms; therefore, Wells Fargo did not owe Plaintiff a duty of care when reviewing the applications"].) We need not, however, weigh in on the debate in this particular case. Sorokko does not rely on *Jolley*, *Alvarez* or a lender's duty to a borrower to support his complaint, and the facts of Sorokko's case are distinguishable from most loan modification cases because he never reached the stage of *submitting* a loan modification application.[7] Sorokko consequently fails to state any cognizable claim for relief.

B.    *Demurrer Standard of Review*

We review an order sustaining a demurrer de novo, exercising our independent judgment as to whether, as a matter of law, the complaint states a cause of action on any available legal theory. (See *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501.) We "assume the truth of the complaint's properly pleaded or implied factual allegations. [Citation.] . . . In addition, we give the complaint a reasonable interpretation, and read it in context. [Citation.] . . . If the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) The plaintiff may demonstrate in the appellate court that an amendment would cure the defect even if he failed to do so in the trial court. (*Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 748.)

_____

[7] Sorokko represents in his briefing, without citation to the record, that he submitted "several loan modification applications" after he filed suit, without response or acknowledgement from BANA. None of his causes of action are based on such applications, assuming they were made.

10

C.    *Promissory Estoppel*

" ' "The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.' " ' " (*Aceves v. U.S. Bank, N.A.* (2011) 192 Cal.App.4th 218, 225 (*Aceves*).)

Sorokko cites cases allowing borrowers' promissory estoppel claims to go forward based on allegations the borrowers were granted temporary loan modifications; they made payments under the temporary arrangement; the lender denied or failed to act on a permanent modification in bad faith; and the lender then foreclosed or pursued foreclosure on their homes.  (See *Bushell v. JPMorgan Chase Bank, N.A., supra,* 220 Cal.App.4th at pp. 919–921, 929–930; *West v. JPMorgan Chase Bank, N.A., supra,* 214 Cal.App.4th at pp. 803–805; see also *Fleet v. Bank of America, N.A., supra,* 229 Cal.App.4th at pp. 1406–1407, 1412–1413; *Alimena v. Vericrest Financial, Inc.* (E.D.Cal. 2013) 964 F.Supp.2d 1200, 1205–1208, 1216–1220.)  In *Bushell*, the borrowers were told that if they complied with the temporary modification terms, " 'we will modify your mortgage loan and you can avoid foreclosure.' " (*Bushell*, at pp. 919–920; see *Fleet*, at p. 1409; *Alimena*, at p. 1216.)  In *West*, the trial modification agreement was construed to include a similar promise.  (*West*, at pp. 797–798.)

Sorokko was never granted a temporary loan modification nor was he promised a permanent modification if he complied with specified conditions.  In fact, Sorokko does not allege any clear and unambiguous promise on which he could rely.  He alleges he was advised in 2009 that BANA had alternatives to foreclosure "for [Sorokko]," that BANA would help Sorokko explore those alternatives, and that BANA had no intention of foreclosing (presumably, while exploration of the alternatives took place).  At best, these statements amounted to a promise to "explore alternatives" with Sorokko and to forbear from pursuing foreclosure while doing so.  Sorokko has cited no case and we have found no case holding that such a promise *alone*—unsupported by acceptance of a loan modification application or at least clear instructions on how to apply for a

11

modification—is sufficient to support a promissory estoppel claim. That is, no court has held that an initial optimistic but generic conversation about vague alternatives to foreclosure is a clear and unambiguous promise sufficient to trigger reasonable and foreseeable reliance to the detriment of the borrower, particularly for a period of three and one half years during which the lender takes no further action to carry through on the alleged promise.

Sorokko relies heavily on *Aceves, supra,* 192 Cal.App.4th 218, which in turn relies in part on *Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031. In the latter case, the lender promised to postpone foreclosure if the borrowers needed more time to close on a loan that the borrowers needed to cure their default. (*Id.* at pp. 1035–1036.) Relying on the promise, the borrowers refinanced other property they owned at a high interest rate. The lender, however, breached its promise and sold the property at a foreclosure sale. (*Id.* at pp. 1041–1042.) The appellate court held the lender's promise was sufficiently clear and unambiguous to be enforceable (*id.* at pp. 1045–1046), and the borrowers suffered detriment by "procuring a high cost, high interest loan" (*id.* at p. 1041). Here, Sorokko does not allege a similarly unambiguous promise that would foreseeably induce detrimental reliance by the borrower in the foreseeable short term.

In *Aceves, supra,* 192 Cal.App.4th 218, the borrower defaulted on her mortgage, filed for chapter 7 (11 U.S.C. §§ 701–784) bankruptcy, and planned to convert her case to chapter 13 (11 U.S.C. §§ 1301–1330), which would have afforded her options to avoid foreclosure. Her lender promised to work with her on a loan modification if she refrained from further bankruptcy proceedings and allowed the bankruptcy stay to be lifted. She agreed. The bank, however, double tracked, processing her loan for foreclosure at the same time it invited her to submit documents for a possible loan modification. After the bankruptcy stay was lifted, "the bank did not work with [the borrower] in an attempt to reinstate and modify the loan" (*id.* at p. 221) and foreclosed on the home. (*Id.* at pp. 221–224.) The court held that the lender's promise was enforceable even though it promised only to negotiate a *possible* loan modification, not to actually modify the loan. (*Id.* at p. 226.) Moreover, the borrower's reliance was reasonable and foreseeable because a

loan modification "would have been more beneficial to [the borrower] than the relief she could have obtained under chapter 13." (*Id.* at p. 227.) The borrower nevertheless suffered detriment because she lost rights that she would have had in a chapter 13 bankruptcy proceeding that would have been preferable to foreclosure, including the right to cure the default and reinstate the loan to predefault conditions with up to five years to pay the arrearages. (*Id.* at pp. 229–230.) The borrower had affirmatively alleged that she could and would have taken advantage of these rights if she had gone through with the chapter 13 filing. (*Id.* at p. 230.)

The *Aceves* borrower's circumstances are distinguishable from those of Sorokko. *Aceves*, in our view, is more akin to a breach of contract case than promissory estoppel: the lender conditioned its promise to consider a loan modification on a specific action by the borrower—nonopposition to lifting the bankruptcy stay, without which a foreclosure could not proceed. In other words, the borrower's cooperation in releasing the stay was bargained-for consideration for the promise to consider her for a loan modification—a promise the lender failed to honor. Here, no such exchange of promises occurred. Moreover, Sorokko does not allege that BANA promised to consider him for a loan modification *if* he refrained from filing for bankruptcy. He alleges a BANA representative told him "you should explore" other alternatives before filing for bankruptcy or said that, in her experience, the only person who failed to save her home was the one who filed for bankruptcy. Neither of these statements was a promise. (See *Granadino v. Wells Fargo Bank, N.A.* (2015) 236 Cal.App.4th 411, 413–414, 417–418 [statement that trustee's sale was no longer scheduled was not a promise that it would not be scheduled as long as the loan modification was under review].)

We affirm the trial court's dismissal of Sorokko's promissory estoppel claim.

D.    *Fraud*

On appeal, Sorokko clarifies that his fraud claim is based on a theory of promissory fraud. "A cause of action for promissory fraud requires the plaintiff to allege that the promissor did not intend to perform at the time the promise was made, that the promise was intended to deceive and induce reliance, that it did induce reliance, and that

13

this reliance resulted in damages." (*Fleet v. Bank of America, N.A., supra,* 229 Cal.App.4th at p. 1411.) "Each element in a cause of action for fraud or negligent misrepresentation must be factually and specifically alleged." (*Cadlo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513, 519.)

Assuming for purposes of argument that the alleged promise to "explore alternatives" and forbear from pursuing foreclosure while doing so was sufficiently clear to support a fraud claim, the claim nevertheless fails because Sorokko cannot establish reasonable and foreseeable reliance on such a promise *alone*—unsupported by acceptance of a loan modification application or even clear instructions on how to apply for a modification—over a period of three and one-half years during which the lender took no further action to carry through on the alleged promise.

We thus affirm the trial court's dismissal of Sorokko's promissory fraud claim based on BANA's loan modification conduct.

### E.     *Negligent Misrepresentation*

Sorokko premises his negligent misrepresentation claim on the same promises that underlie his promissory fraud claim. He argues, "if the cause of action for fraud and deceit has been properly pled, . . . a cause of action for negligent misrepresentation can be properly pled simply by omitting all allegations of intent to deceive . . . ." However, there is no cognizable claim for negligent misrepresentation based on a promise. (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158–159.) Therefore, we affirm the trial court's dismissal of Sorokko's negligent misrepresentation claim.

### F.     *Negligence*

" 'To state a cause of action for negligence, a plaintiff must allege (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's damages or injuries.' " (*Alvarez, supra,* 228 Cal.App.4th at p. 944.)

Sorokko argues BANA owed him a duty of care because it acted as a loan servicer rather than a lender. While the case authority is split regarding the existence of a duty of

care in this context, the cases we have reviewed appear to agree that the duty of care analysis for lenders and loan servicers is identical, i.e., where no duty of care exists for a lender, no duty of care exists for the servicer. (See *Lueras, supra,* 221 Cal.App.4th at pp. 64–65; *Jolley, supra,* 213 Cal.App.4th at p. 904; *Alvarez, supra,* 228 Cal.App.4th at p. 951.)

Sorokko does not address the split in authority about whether lenders (or loan servicers) owe a duty of care to borrowers in the loan modification context, and he does not argue that a duty arises from application of the *Biakanja* factors. Instead, Sorokko suggests that BANA owed what amounts to a *fiduciary* duty toward him—a higher standard of care—because of its "confidential relationship with [him] as a consequence of filling the servicer's role." We are wholly unpersuaded by this argument. " ' "The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." ' [Citation.] Fiduciary obligations 'generally come into play when one party's vulnerability is so substantial as to give rise to equitable concerns . . . .' " (*Brown v. Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4th 938, 960.) In *Brown*, a financial adviser urged the plaintiffs to sign a brokerage agreement without explaining that it included an arbitration clause, even though she knew the plaintiffs were elderly and had failing vision. (*Id.* at pp. 946–950.) The court held there was substantial evidence the adviser was in a fiduciary relationship with the plaintiffs and remanded for the trial court to determine if the agreement was rendered unenforceable by constructive fraud in its execution. (*Id.* at pp. 958–962.) As a borrower in default, Sorokko may well have been financially vulnerable compared to BANA, but he did not repose trust and confidence in BANA over his financial affairs; rather, he simply made inquires about loan modification, an ordinary commercial transaction.

We also conclude that, regardless of whether one agrees with the reasoning of *Alvarez* or *Lueras*, BANA did not owe Sorokko a duty of reasonable care on the facts he alleged: Sorokko was never promised a loan modification and did not even submit an

15

application for loan modification.  In *Adams v. PNC Bank, N.A.* (N.D.Cal., Dec. 29, 2014, No. 5:14-cv-04330) 2014 U.S.Dist. Lexis 177887, the borrower "inquired into applying for a loan modification on his second loan" and "Defendants advised him against making any additional payments . . . until his loan modification was finalized.  Ultimately, a Notice of Trustee's Sale was recorded . . . followed shortly thereafter by a Trustee's Sale." (*Ibid*.)  The court concluded that the *Biakanja* factors "weigh[ed] against finding any duty, especially where as here . . . the application for loan modification never progressed to a concrete stage." (*Ibid*.)  We are aware of no state or federal opinion finding a duty on similar facts.

Sorokko argues that his negligence claim is supported by allegations regarding LIBOR (the average interbank interest rate at which a selection of banks on the London money market are prepared to lend to one another).  He relies on his general allegations that BANA "knowingly manipulate[ed] and inflat[ed] the LIBOR index, from which [Sorokko's] adjustable interest rates were calculated" and "their use of LIBOR was infected by fraud."  As these allegations expressly acknowledge, these are fraud allegations, not negligence allegations.  Sorokko, however, does not base his fraud claim on these allegations, nor does he plead them with particularity.

We affirm the trial court's dismissal of Sorokko's negligence claim.

G.      *Breach of the Implied Covenant of Good Faith and Fair Dealing*

"The covenant of good faith and fair dealing is imposed upon each party to a contract.  [Citation.]  This fundamental covenant prevents the contracting parties from taking actions that will deprive another party of the benefits of the agreement.  [Citation.] . . . [¶] '[T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract.'  [Citation.] . . . [¶] . . . '[Moreover, a] prerequisite for any action for breach of the implied covenant of good faith and fair

16

dealing is the existence of a contractual relationship between the parties . . . .' " (*Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 524–525.)[8]

Sorokko presented two theories of this cause of action in his complaints and presents a third theory on appeal. None is persuasive.

Sorokko first alleged that "the cont[r]act between [Sorokko] and [BANA] contains an implied covenant of good faith and fair dealing" and that BANA acted in bad faith in its interactions with him about possible alternatives to foreclosure. But Sorokko did not expressly identify a *contract* he had with BANA that would support the claim. We agree with the trial court that the implied covenant cannot create new obligations not contemplated by an express contract, and Sorokko did not allege that the Loan documents required BANA to discuss or offer a loan modification. (See *Alvarez v. Wells Fargo Bank, N.A.* (N.D.Cal., Jan. 31, 2013, No. CV 12-09661) 2013 U.S.Dist. Lexis 14304.)

Sorokko alleged in his first amended complaint that BANA "as servicer of [the Loan] was a contract partner obliged by these duties to evaluate, explain and recommend to [Sorokko] all appropriate options [BANA] could provide to assist [Sorokko] avoid foreclosure." Again, Sorokko did not identify the contract to which BANA was an alleged partner. The trial court noted that Sorokko failed to allege he was a third party

---

[8] As noted *ante*, Sorokko asserted a claim for breach of fiduciary duty in his original complaint, but replaced it with a good faith and fair dealing claim in his first amended complaint. On appeal, Sorokko contends that he can amend his complaint to allege that BANA was in a confidential relationship with him with respect to the servicing of his Loan. He argues that, with such allegations, "the duty of good faith and fair dealing would be all the more meaningful." However, Sorokko cites no authority that the existence of a confidential relationship is relevant to a claim for breach of the implied covenant and we are aware of no such authority. Nor does Sorokko directly argue that he stated or can state a valid claim for breach of fiduciary duty. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [each argument must be presented under a separate heading]; *300 DeHaro Street Investors v. Department of Housing & Community Development* (2008) 161 Cal.App.4th 1240, 1257 [argument forfeited if not set forth in separate heading].) Therefore, we ignore these arguments. (See *Rufini v. CitiMortgage* (2014) 227 Cal.App.4th 299, 312 [rejecting breach of fiduciary duty claim in foreclosure context]; *Sutherland v. Barclays American/Mortgage Corp.* (1997) 53 Cal.App.4th 299, 313–314 [rejecting good faith and fair dealing tort claim in foreclosure context].)

17

beneficiary of a contract between BANA and some other entity. In an analogous case, another division of this district has held that a borrower was not a third party beneficiary of a contract between the federal government and lenders that imposed loan servicing standards. (*Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1282, fn. 17.) Courts have also rejected the theory that borrowers are third party beneficiaries of the National Mortgage Settlement. (See, e.g., *Jurewitz v. Bank of America, N.A., supra,* 938 F.Supp.2d at p. 997–998.) Thus, Sorokko's "contract partner" theory is unpersuasive. In any event, he does not pursue the theory on appeal.

In his appellate briefs, Sorokko premises the claim on BANA's promise to consider Sorokko for a loan modification, which he argues was supported by the consideration of Sorokko's forbearing from filing for bankruptcy. However, Sorokko cites no authority that forbearance from filing for bankruptcy—or any of the other forms of reliance he has alleged—amounts to consideration sufficient to establish *contract formation*, and we are unaware of any such authority. (Cf. *West v. JPMorgan Chase Bank, N.A., supra,* 214 Cal.App.4th at pp. 796–797 [temporary loan modification contract supported by consideration of modified payments].) Moreover, to support a contract claim, Sorokko would have to overcome a statute of frauds bar, an issue he does not address on appeal. (See *id.* at p. 798.)

We therefore affirm the trial court's dismissal of Sorokko's claim for breach of the covenant of good faith and fair dealing.

H.    *Violations of Nonjudicial Foreclosure Statutes*

Sorokko represents on appeal that on remand he can assert statutory causes of action under HBOR (§§ 2920–2944.7). HBOR, which now prohibits the practice of dual tracking, was clearly intended to ensure that borrowers now be fairly "considered for, and have a meaningful opportunity to obtain, available loss mitigation options" in order to avoid foreclosure (§ 2923.4, subd. (a)), and to obviate the problem, exemplified by Sorokko's allegations, of "being given the runaround, being told one thing by one bank employee while something entirely different is being pursued by another." (*Jolley,*

18

*supra,* 213 Cal.App.4th at p. 905.)[9] However, HBOR did not become effective until January 1, 2013, after Sorokko filed this action. HBOR does not have retroactive effect (see *Banks v. JPMorgan Chase Bank, N.A.* (C.D.Cal., Nov. 19, 2014, No. CV14-06429) 2014 U.S. Dist. Lexis 164565) and applies to none of Sorokko's first amended complaint's alleged facts.

## I.      *UCL*

"The UCL permits civil recovery for 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . .' (Bus. & Prof. Code, § 17200.) ' "Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent . . . ." ' [Citation.] [¶] [T]he UCL [also] permits violations of other laws to be treated as independently actionable as unfair competition." (*West v. JPMorgan Chase Bank, N.A., supra,* 214 Cal.App.4th at pp. 805–806.)

The trial court dismissed Sorokko's UCL cause of action because it was premised on his other causes of action, all of which had already been dismissed by the court. Because we have affirmed the dismissal of all of Sorokko's other causes of action, we also affirm the trial court's dismissal of the UCL claim.

## III.      DISPOSITION

The judgment is affirmed.

---

[9] "The kindest interpretation to place on this scenario is lender incompetence—the left-hand loan modification department and the right-hand foreclosure department appear to be operating in total ignorance of each other. This is the most likely explanation, given the size of the institutions involved, but it is not the only one, and as the numbers of such cases grow, other less benign explanations are coming to more and more minds." (*Fleet v. Bank of America, N.A.*, *supra,* 229 Cal.App.4th at p. 1408.)

_____

BRUINIERS, J.

WE CONCUR:


_____

JONES, P. J.


_____

NEEDHAM, J.

A140544